**VALERO ENERGY CORPORATION, et al., Appellants,**

v.

**The M.W. KELLOGG CONSTRUCTION COMPANY, et al., Appellees.**

No. 13–91–666–CV.

Court of Appeals of Texas, Corpus Christi.

June 30, 1993.

[Motion to Publish Granted, Nov. 17, 1993.]

Rehearing Denied Nov. 17, 1993.

William R. Edwards, Edwards & Terry, Corpus Christi, Mike A. Hatchell, Molly H. Anderson, Tom Henson, Gregory D. Smith, Ramey & Flock, Tyler, Thomas H. Watkins, Hilgers & Watkins, P.C., Austin, David M. Waterson, Jr., San Antonio, for appellants.

Christopher Langen, David H. Kagan, John M. Calimafde, Hopgood, Calimafde, Kalil, Blaustein & Judlowe, New York City, John B. Shely, Taylor M. Hicks, Jr., Andrews & Kurth, Houston, Joseph Katarincic, Kenneth L. Salmon, Terrence J. O'Rourke, Katarincic & Salmon, Pittsburgh, Rudy Gonzales, Jr., Harvey Ferguson, Jr., Chaves, Gonzales & Rodriguez, Corpus Christi, David Healey, Michael J. Stanley, Charles S. Kelley, Weil, Gotshal & Manges, Houston, for appellees.

Before DORSEY, SEERDEN and FEDERICO G. HINOJOSA, Jr., JJ.

### OPINION

DORSEY, Justice.

Valero Energy Corporation[1] appeals from a summary judgment entered in a negligence and deceptive trade practices case. The trial court found that a waiver provision in the parties' goods and services contract was valid and therefore Valero had no cause of action against appellees Kellogg and Ingersoll–Rand. By eighteen points of error, Valero complains of the judgment as well as a sanction striking its defenses to the contract. We affirm.

In July, 1979, Saber Energy, Inc. (now Valero)[2] sought Kellogg's construction, engineering, and design services for a $500 million expansion of its Corpus Christi oil refinery. The parties negotiated an agreement until May 28, 1982, and signed a contract on that date. During the negotiations period, Kellogg tendered bargained-for services to Valero, which were included in the final contract; on the date of the signing of the contract, Kellogg had delivered some $15 million in goods and services to Valero.

Valero hired appellee Ingersoll–Rand, who would become a Kellogg subcontractor, in early 1981 to supply machinery for the refinery expansion. This machinery, called a Power Recovery Unit, consists of an expander, a compressor, a motor generator, and a steam turbine. The expander, which is used to derive mechanical energy from the hot gases emitted from the refining process, was delivered to the Valero refinery in September, 1982. That piece of equipment forms the basis of this suit, as it failed and exploded on May 3, 1988, causing damages to the Valero plant. Appellant maintains that flying shrapnel from the explosion damaged structural I-beams, a pipe rack, and several tons of catalyst.

Valero brought suit against Kellogg and Ingersoll–Rand alleging, among other actions, products liability, gross negligence, and violations of the Deceptive Trade Practices–Consumer Protection Act.[3] Both defendants filed motions for summary judgment based upon certain provisions of the contract, the most important of which were waiver, indemnity, and hold-harmless clauses. Ingersoll–Rand also alleged that Valero's suit was barred by limitations and that the appellant failed to properly allege actions sounding in tort, having suffered only economic damage.

Five years later, Valero filed a fifth amended original petition alleging for the first time defenses to the contract including, among others, fraud, unconscionability, duress, unenforceability of the waiver and indemnity provisions, and public policy. Valero filed a motion for partial summary judgment based upon that amended petition. The trial court ultimately struck, as a sanction, all pleadings, affidavits, and exhibits filed by Valero in connection with four of its defenses to the contract: unconscionability, fraud, duress, and adhesion.

Valero filed several subsequent amended petitions alleging essentially the same defenses. The trial court granted summary judgment in favor of Kellogg and Ingersoll–Rand. It is from those judgments that Valero appeals.

By point of error 18, appellant maintains that the trial court erred by imposing the sanction against it. We review the propriety of the sanction order to determine whether the court committed a clear abuse of discretion when imposing it. *TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 916–17 (Tex.1991); *Bodnow Corp. v.*

---

1. Valero Energy Corp. appears individually and as the parent corporation of Valero Refining and Marketing Co. Valero Refining and Marketing Co. appears for itself and as the parent corporation of Valero Refining Co. Valero Refining Co. appears individually. The parties will be collectively referred to here as "Valero."

2. Valero Energy Corp. is Saber's successor in interest, having purchased 50% of Saber's corporate stock in October 1980 and the remainder in the fall of 1984. Saber Energy, Inc. then changed its name to Valero Refining & Marketing Co. and Saber Refining Co. became Valero Refining Co.

3. *See* Tex.Bus. & Com.Code Ann. § 17.41 *et seq.* (Vernon 1977).

*City of Hondo,* 721 S.W.2d 839, 840 (Tex. 1986); *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). Sanctions must be just; we look to whether a direct relationship exists between the offensive conduct and the sanction imposed, and to whether the sanction is excessive. *Remington Arms Co., Inc. v. Caldwell,* 850 S.W.2d 167, 170 (1993); *Chrysler Corp. v. Blackmon,* 841 S.W.2d 844 (Tex.1992); *TransAmerican,* 811 S.W.2d at 916–17. Sanctions are appropriate when the sanctioned party's conduct " 'justifies a presumption that its claims or defenses lack merit.' " *Caldwell,* 850 S.W.2d at 171 (quoting *Chrysler,* 841 S.W.2d at 849).

Valero submitted only the affidavit of its in-house counsel, Mr. Cantrell, to support its unconscionability, fraud, duress, and adhesion defenses. In his affidavit, Cantrell averred that

> I was concerned about article 6.8 and 6.9 of the contract relating to liability and indemnity and throughout the negotiations attempted to seek a better position for Valero. By May of 1982, however, it was apparent to me that Valero had no choice but to agree to the indemnity and release clauses required by Kellogg. * * * *
>
> Additionally, throughout the contract negotiations, when we raised the issues of the exculpatory, indemnification, and liability limitations language in the draft contract, Kellogg told us not to worry about those provisions, because Kellogg had the expertise to make the project work, and was going to do the job right.

Appellees sought to depose Cantrell to inquire about his concerns and the advice he gave to Valero executives during negotiations. Valero agreed. During the deposition, however, Cantrell was instructed not to respond to any questions related to information or beliefs he submitted to Valero executives during the negotiation of this contract. Counsel asserted attorney/client privilege in support.

Some two weeks after the deposition adjourned, Valero sent letters to all parties,

stating that it would waive the attorney/client privilege as to Cantrell, contingent upon a later determination by the court about whether the information obtained from him was in fact privileged, and whether the information was relevant. Valero refused to waive the privilege with regard to any additional depositions focusing upon unconscionability and related defenses, however.

Kellogg and Ingersoll–Rand filed motions to strike Valero's pleadings. They contended that both discovery abuse and abuse of the litigation process justified a sanction order. The parties highlighted Valero's failure to file affirmative defenses to the enforcement of the contract until five years after the defendants first asserted waiver as a defense to that contract. The parties also asserted that Valero had, by its actions, chosen to go forward with its attorney/client privilege assertion, thereby abandoning its affirmative defense allegations.

■ Texas law will not permit a party to raise a claim or defense in a lawsuit, then attempt to stave off discovery related to that allegation through the use of privilege. In *Ginsberg v. Fifth Court of Appeals,*[4] a mandamus proceeding, the underlying action concerned the validity of a ratification deed executed between the parties. The plaintiff contended that the defendant fraudulently induced her to sign the deed, and that she did not remember signing it. She stated during a deposition that she was being treated by a psychiatrist at the time she signed the deed. Defendant attempted to discover plaintiff's medical records, but she refused, citing psychiatrist/patient privilege. The supreme court found that plaintiff "has invoked the jurisdiction of the courts in search of affirmative relief against [defendant]; yet she would attempt, on the basis of privilege, to deny [defendant] that benefit of evidence which would materially weaken or defeat her claims against him." *Id.* at 107. The court refused to condone this offensive use of a privilege. *Id.*

> A plaintiff cannot use one hand to seek affirmative relief in court and with the other lower an iron curtain of silence

4. 686 S.W.2d 105 (Tex.1985).

against otherwise pertinent and proper questions which may have a bearing upon his right to maintain his action.

*Id.* at 108 (citation omitted).

The rationale behind this rule was first applied in cases in which the Fifth Amendment privilege against self-incrimination was offensively utilized. *Id.* (citing *Henson v. Citizens Bank of Irving,* 549 S.W.2d 446, 448 (Tex.Civ.App.—Eastland 1977, no writ)). The *Henson* court noted the plaintiff's fundamental right to assert his Fifth Amendment privilege, but held that, based on principles of fundamental fairness, the plaintiff may be forced to elect to renew his claim of privilege or to abandon his claim. *Henson,* 549 S.W.2d at 448.

In *Parten v. Brigham,*[5] the court recognized that the attorney/client privilege, too, may not be used offensively to hinder the other party's discovery efforts. In that divorce and property settlement case, plaintiff sought to set aside the divorce decree on the ground that defendant fraudulently concealed community assets. The defendant alleged that he gave all property information to plaintiff's attorney, whose knowledge was therefore imputed to plaintiff. When defendant attempted to substantiate this through the deposition of plaintiff's attorney, plaintiff asserted the attorney-client privilege. The court held that the assertion of the attorney/client privilege was an impermissible offensive maneuver and that plaintiff may be forced to elect between assertion of the privilege and abandonment of her claim. *Id.* at 168.

More closely on point is *DeWitt and Rearick, Inc. v. Ferguson.*[6] In that case, the plaintiffs had settled an underlying related lawsuit. Plaintiffs contended that they did so on the advice of counsel. Defendants sought to delve into this advice more thoroughly, but the plaintiffs asserted their attorney/client privilege. The court applied the *Ginsberg* rationale, finding that plaintiffs were using their privilege as "an iron curtain of silence." *DeWitt,* 699 S.W.2d at 694. The court held that the plaintiffs would be forced

to take an election, either reiterating their privilege assertion or abandoning their claim. *DeWitt,* 699 S.W.2d at 696. The court concluded that if the plaintiffs pursued their claim, they would abandon their privilege. *Id.*

A review of the sanctions hearing in this case reveals that the trial court found Valero had initially waived its attorney-client privilege by filing its affirmative defenses and the affidavit of Counselor Cantrell in sole support of those allegations. The court then found that Valero's post-deposition letter offering to waive the privilege to a limited degree was meaningless, and that Valero had in fact elected to stand firmly on its attorney/client privilege invocation. As a result, the court determined that Valero had abandoned those affirmative defenses supported only by Counselor Cantrell's affidavit: unconscionability, fraud, duress, and adhesion. Finding this, the trial court struck those portions of Valero's pleadings, summary judgment motion, and supporting affidavits related to the abandoned claims.

We fail to find error in the trial court's actions. The court did not abuse its discretion, but rather followed the law of the courts of Texas when making its determination. We will not overturn the court's order. Point of error 18 is overruled.

By points ten through seventeen, Valero contends that the trial court erroneously granted summary judgment in favor of appellees and denied Valero's own motion for partial summary judgment, on the grounds that Valero had contractually waived its claims for gross negligence and products liability.

The contract negotiated and signed by Kellogg and Valero in May 1982 included a waiver and release provision, allocating the risks of the project and holding Kellogg and its subcontractors harmless against all claims, liabilities, losses, or expenses arising out of the work to be performed under the contract. Kellogg provided a two-year guarantee in return, promising to correct and re-engineer any defects in the refinery for two

---

5. 785 S.W.2d 165 (Tex.App.—Fort Worth 1989, orig. proceeding).

6. 699 S.W.2d 692 (Tex.App.—El Paso 1985, orig. proceeding).

years after the completion of the project. The contract was deemed retroactive, relating back to October 14, 1980, the inception of Kellogg's performance under the agreement.

■ Valero essentially argues that a waiver of liability for gross negligence offends public policy and that a general contract disclaimer or waiver of liability will not prevent a party from suing on a products liability theory. We disagree.

■ When determining whether the trial court properly granted one party's motion for summary judgment and denied another's, we examine the record to discern whether the summary judgment proof established as a matter of law that no genuine issue of material fact existed on one or more essential elements of the plaintiff's cause of action. *Gibbs v. General Motors Corp.*, 450 S.W.2d 827, 828 (Tex.1970). We take all evidence favorable to the losing party as true and indulge all reasonable inferences in that party's favor. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985).

The Kellogg/Valero contract contains a section expressly devoted to liability and insurance, preliminarily setting out the property and bodily injury insurance to be provided by both Valero and Kellogg. Several waiver provisions follow these insurance stipulations, allocating liability between the parties. The provisions at issue provide:

> 6.8 OWNER shall release, defend, indemnify and hold harmless CONTRACTOR, its subcontractors and affiliates and their employees performing services under this Agreement against all claims, liabilities, loss or expense ... arising out of or in connection with this Agreement or the Work to be performed hereunder, including losses attributable to CONTRACTOR'S negligence, to the extent CONTRACTOR is not compensated by insurance carried under this ARTICLE.
> * * * *
> 6.9 Neither CONTRACTOR nor its affiliates nor its subcontractors or vendors, either individually or jointly shall be liable to OWNER or its affiliates, irrespective of whether alleged to be due to negligence or otherwise, for loss of anticipated profits or

interest, for loss by reason of Plant shutdown or non-operation of the Plant or other equipment, for loss of catalysts or chemicals or for any consequential or special loss or damage arising from any reason whatsoever.

The contract provides similar release and indemnification clauses stating that Kellogg and its subcontractors will hold Valero harmless for property damage or bodily injury they sustain as a result of Valero's actions, to the extent the injuries are covered by the insurance required by the agreement.

■ Parties may agree to exempt one another from future liability for negligence so long as the agreement does not violate the constitution, a statute, or public policy. *Allright, Inc. v. Elledge*, 515 S.W.2d 266, 267 (Tex.1974); *Crowell v. Housing Auth. of the City of Dallas*, 495 S.W.2d 887, 889 (Tex. 1973); *Derr Constr. Co. v. City of Houston*, 846 S.W.2d 854, 859 (Tex.App.—Houston [14th Dist.] 1992, no writ); *Interstate Fire Ins. Co. v. First Tape, Inc.*, 817 S.W.2d 142, 145 (Tex.App.—Houston [1st Dist.] 1991, writ denied). When the parties to the contract are private entities bargaining from positions of substantially equal strength, the agreement is usually enforced. *Elledge*, 515 S.W.2d at 267; *Crowell*, 495 S.W.2d at 889; *First Tape*, 817 S.W.2d at 145. If one party is so disadvantaged that it is essentially forced to agree to an exculpatory provision, that provision will be declared void. *Elledge*, 515 S.W.2d at 267–68; *Crowell*, 495 S.W.2d at 889.

■ Valero and Kellogg are sophisticated entities, replete with learned counsel and a familiarity with the oil refinery industry. They negotiated their working relationship over the course of almost three years, with Kellogg submitting several proposals for Valero's review. During the negotiations process, Kellogg began performing services ultimately included under the retroactive contract. Work was begun on October 14, 1980; the contract was signed, after some $15 million worth of goods and services had been conveyed to Valero, on May 28, 1982. Valero, having a bargaining power equal to Kellogg's, agreed to the exculpatory clause in this contract. Valero possessed the re-

sources necessary to ascertain and understand the rights it held on the date of the signing of the contract, and those it would hold in the future. Nevertheless, Valero, of its own accord, negotiated those rights away.

The waiver and indemnity provision absolving Kellogg of all liability sounding in products liability and gross negligence does not offend public policy.

Similarly, Ingersoll–Rand, as one of Kellogg's subcontractors, is also addressed in the Valero/Kellogg contract as an entity entitled to protection under the waiver and hold-harmless clauses. As such, it, too is held harmless and is indemnified under the contract fairly negotiated between Kellogg and Valero. Points ten through seventeen are overruled.

By points five through eight, appellant maintains that the trial court erred by granting appellees' motions for summary judgment and denying its own on the grounds that Valero waived its DTPA claims against Kellogg and Ingersoll–Rand. The issue is which version of the DTPA applies in this case. Appellant contends that the 1977 version applies, the one in effect at the time the parties began negotiating this contract (1979) and at the time Kellogg began performing under it (1980). Appellees allege that the 1981 version, the one in effect at the time the contract was signed (1982), is the applicable provision.

The crux of the dispute remains whether the waiver and hold-harmless provisions in the contract are valid under the DTPA. Prior to August 31, 1981, the DTPA mandated that "any waiver by a consumer of the provisions of this subchapter is contrary to public policy and is unenforceable and void." TEX. BUS. & COM.CODE ANN. § 17.42 (Vernon 1977). On August 31, 1981, section 17.42 was amended to allow that "a consumer ... with assets of $25,000,000 or more at the time of such transactions, acts or practices, may by written contract waive the provisions of this subchapter...." TEX.BUS. & COM.CODE ANN. § 17.42 (Vernon 1981).

Appellant argues that the 1981 amendment to the DTPA is to be applied prospectively only and that any cause of action arising in whole or in part prior to August 31, 1981, will not be affected by the provision allowing waivers by sophisticated corporations. *Citing* Acts 1981, 67th Leg., p. 863, ch. 307, § 1. Valero asserts that because it began negotiations with Kellogg in July, 1979, and with Ingersoll–Rand in early 1981, the pre–1981 version of the DTPA must apply.

Valero maintains that Kellogg and Ingersoll–Rand made false representations during their respective negotiating periods, representing that the services and goods they would tender had characteristics that they did not have, and were of a particular standard, quality, or grade when they were of another. Valero complains of representations made by Kellogg such as "(i) its ability to design the project ... (ii) its ability to evaluate technology ... (iii) its ability to develop an 'engineering plan' ... and to ensure engineering being continuously applied in a professional manner ... and (iv) its ability to supply project managers 'who would be accountable for the performance [of Kellogg].'" Valero complains of similar representations made by Ingersoll–Rand regarding the merits of its expander and related services.

These allegedly false representations having been made during the negotiating periods, Valero asserts that its DTPA causes of action arose at least in part at those times, and therefore the pre–1981 version of the Act must apply to Kellogg and Ingersoll–Rand.[7] Citing *American Petrofina, Inc. v. PPG Indus., Inc.,* 679 S.W.2d 740, 747 (Tex.App.— Fort Worth 1984, writ dism'd by agr.).

Kellogg counters that the version of the DTPA in effect at the time the relevant contract is signed provides the controlling law. It quotes, "a contract executed before the effective date of this Act is governed by the law in effect when the contract was executed." Amendatory Act of 1983, 68th Leg., R.S., ch. 883, § 4, 1983 Tex.Gen.Laws 4943 (amended 1991). Ingersoll–Rand maintains that the provision in effect on the date the product at issue was delivered is the appropriate directive.

7. For purposes of Valero's argument regarding the validity of the DTPA waivers, the 1977 and 1979 versions are identical.

We hold the date Valero signed the contract, which it now wishes to repudiate on the grounds of unconscionability and economic duress, is the relevant date of inquiry. Kellogg and Valero negotiated this contract for almost three years. The final agreement contains a concluding article, Article 20, entitled "Entire Agreement; Representations; Warranties; Etc." The Article provides, in pertinent part,

20.1 This Agreement ... sets forth the entire understanding of the parties and supersedes any and all previous agreements and representations made prior to the date of execution of this Agreement.

20.2 The making, execution and delivery of the Agreement by OWNER and by CONTRACTOR have been induced by no representations, statements, warranties or agreements other than those herein expressed. . . .

At the time of the signing of the contract, both parties were presumed to know the laws affecting their contract. They were presumed to know their rights, duties, and obligations under that contract.

On May 28, 1982, the date Valero and Kellogg signed this agreement, Valero waived any claims that may have vested against Kellogg and against Ingersoll–Rand, its subcontractor, for deceptive trade practices. At that time, the August 31, 1981, DTPA amendment allowing large corporations to waive their rights under the Act had been in effect for almost a year. Valero, a sophisticated corporation, is charged with knowing the law affecting the contract on the date that it was signed. Notwithstanding when the causes of action at issue here accrued, whether in 1979, early 1981, or much later, in 1982, the law allowed large corporations to waive their DTPA causes of action. This Valero did when it signed this contract. Points five through eight are overruled.

We have addressed every issue raised and necessary to the final disposition of this appeal. TEX.R.APP.P. 90(a).

The trial court's judgment is AFFIRMED.