OXY USA v. Southwestern Energy Prod.















NUMBER 13-03-00075-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI – EDINBURG
                                                                                                                       

OXY USA, INC.,                                                                            Appellant,

v.

SOUTHWESTERN ENERGY PRODUCTION COMPANY,            Appellee.
                                                                                                                       

On appeal from the 164th District Court of Harris County, Texas.
                                                                                                                       

O P I N I O N

Before Justices Hinojosa, Yañez, and Garza
Opinion by Justice Hinojosa

          This case involves an indemnity agreement between two major oil and gas
companies. After both parties filed motions for summary judgment, the trial court granted
the motion of appellee, Southwestern Energy Production Company (“SEPCO”) and denied
the motion of appellant, OXY USA, Inc. (“OXY”). In four issues, OXY contends the trial
court erred in granting SEPCO’s motion for summary judgment and in denying its motion
for summary judgment. We reverse and render.
A. Background and Procedural History
          On June 5, 1997, OXY and SEPCO entered into a Seismic and Exploration
Agreement (“SEA”), effective March 27, 1997, to conduct seismic surveys on an area of
land referred to as the “Bouré project.” The SEA provided that: (1) OXY and SEPCO
would equally share costs for the acquisition and development of three-dimensional
seismic data; (2) OXY would receive fifty percent of the rights in seismic agreements and
oil and gas leases relating to the project; and (3) OXY and SEPCO would each receive a
license to the seismic data acquired. The SEA further provided that OXY and SEPCO
would mutually approve the selection of a contractor to process the seismic data.
          Unbeknownst to OXY, SEPCO had previously entered into a letter agreement
(“Skelly Letter Agreement”) with Skelly Exploration Company, owned by Denny Whinery
(collectively “Skelly”), a consultant to SEPCO. The letter agreement, dated December 16,
1996, provided that SEPCO and Skelly would jointly market a three-dimensional seismic
program for the Bouré project. SEPCO would receive a twenty-five percent working
interest in all permits, options, leases and data processing, as well as a standard license
to the resulting seismic data. Any additional promoted interest or promoted cash would be
owned and retained by Skelly.
          Also unknown to OXY, on April 29, 1997, SEPCO entered into an agreement (“Seitel
Agreement”) with a seismic contractor, Seitel Data Limited (“Seitel”), which provided, in
part, that SEPCO would purchase four nonexclusive licenses to the Bouré project seismic
data. OXY and Skelly were each designated as recipients of a license.
          Shortly after OXY and SEPCO entered into the SEA, SEPCO’s parent company,
Southwestern Energy Company, conducted an internal investigation of SEPCO. After the
investigation, all of SEPCO’s senior management were either terminated or resigned. 
During the investigation, Southwestern Energy discovered inconsistencies between the
SEA and the Seitel Agreement. Upon investigation, Southwestern Energy concluded that
OXY was unaware of both the Skelly Letter Agreement and the Seitel Agreement.
          Following disclosure of the inconsistent agreements, OXY informed SEPCO that
because SEPCO had breached the SEA, OXY would not proceed under the agreement
unless Skelly was removed from the project. OXY also voiced concerns regarding potential
claims by Skelly if the deal were renegotiated to eliminate Skelly’s participation. In
response to OXY’s concerns, SEPCO offered to indemnify OXY against any claims relating
to the Bouré project.
          On October 16, 1997, SEPCO, OXY, and Seitel entered into a new agreement 
(“New Bouré Agreement”). Under this agreement, OXY and SEPCO agreed to each
contribute twenty-five percent of the costs of the seismic shoot; in return, each company
would receive one of four licenses to the data and a fifty percent interest in the Bouré
project. SEPCO and OXY would jointly designate the recipients of the two remaining
licenses. Skelly was not named as a recipient of a license. On December 11, 1997,
SEPCO and OXY entered into a Joint Prosecution and Indemnification Agreement
(“Indemnity Agreement”) in order to alleviate OXY’s concern that Skelly might claim an
interest in the Bouré project. 
          Before entering into the Indemnity Agreement, SEPCO filed suit in federal court on
October 31, 1997, against Whinery, Skelly, and others, including former employees of
SEPCO, for fraud and violations of the Racketeer Influenced and Corrupt Organizations
Act.


 On June 23, 1998, Skelly counterclaimed against SEPCO for breach of contract,
defamation, and tortious interference with prospective economic gain. On June 16, 1999,
SEPCO settled the lawsuit with Skelly and executed a mutual release of claims relating to
the Bouré project. The release failed to include OXY.
          Skelly subsequently sued OXY, alleging tortious interference with contract,
conversion, and abuse of rights. By letter dated November 16, 1999, OXY notified SEPCO
that it had been sued by Skelly, and requested that SEPCO defend and indemnify OXY in
accordance with the Indemnity Agreement. SEPCO responded, without reservation of
rights, that it would defend OXY. SEPCO assumed payment for OXY’s selected defense
counsel, and provided OXY with access to SEPCO’s own local outside counsel. However,
on the eve of trial, on June 16, 2000, SEPCO asserted it was not obligated to indemnify
OXY under the Indemnity Agreement. OXY settled the lawsuit with Skelly for $2.5 million
plus a license to the seismic data. SEPCO contributed $400,000 and the license.
          After settling with Skelly, OXY filed suit against SEPCO, alleging breach of contract
and fraudulent inducement. SEPCO counterclaimed for a declaratory judgment that the
Indemnity Agreement did not cover the claims asserted by Skelly, and, in the alternative,
that the Indemnity Agreement was unenforceable. SEPCO later added a counterclaim for
fraud, alleging that it agreed to defend OXY without knowing that on April 27, 1998, OXY
had conveyed most of its interest in the Bouré project to Petro-Hunt, L.L.C., but had
reserved its rights under the Indemnity Agreement.
          Both parties filed motions for partial summary judgment. The trial court denied
OXY’s motion and granted SEPCO’s motion on the grounds that the Indemnity Agreement
was unenforceable under Texas law and that OXY did not have a right to receive indemnity
from SEPCO based on Skelly’s claims. The trial court later severed the contract claims
from the remaining claims, making the summary judgment final.
B. Standard of Review
          We review the granting of a motion for summary judgment de novo. See Natividad
v. Alexsis, Inc., 875 S.W.2d 695, 699 (Tex. 1994); Tex. Commerce Bank–Rio Grande
Valley v. Correa, 28 S.W.3d 723, 726 (Tex. App.–Corpus Christi 2000, pet. denied). For
summary judgment to be proper, the evidence must establish as a matter of law that there
is no genuine issue of material fact as to any of the essential elements of the plaintiff’s
cause of action, or that the defendant has conclusively established all elements of an
affirmative defense. Walker v. Harris, 924 S.W.2d 375, 377 (Tex. 1996); Crain v. Smith,
22 S.W.3d 58, 59 (Tex. App.–Corpus Christi 2000, no pet.). In deciding whether to sustain
a summary judgment, we accept all evidence favorable to the non-movant as true, and
make all reasonable inferences and resolve all doubts in the non-movant’s favor. Am.
Tobacco Co. v. Grinnell, 951 S.W.2d 420, 425 (Tex. 1997). When both parties move for
summary judgment, and one motion is granted and the other is denied, we must rule on
all questions presented by the motions and render such judgment as the trial court should
have rendered. Comm’rs Court of Titus County v. Agan, 940 S.W.2d 77, 81 (Tex. 1997);
Jones v. Strauss, 745 S.W.2d 898, 900 (Tex. 1988) (orig. proceeding) (per curiam). 
C. Enforceability of the Indemnity Agreement
           In its first issue, OXY contends the trial court erred in granting SEPCO’s motion for
summary judgment and in denying its motion for summary judgment because the
Indemnity Agreement is enforceable as a matter of law. SEPCO contends the Indemnity
Agreement does not satisfy the fair notice requirements promulgated by the supreme court. 
In the alternative, SEPCO asserts that the Indemnity Agreement does not provide
indemnity for intentional tort claims.
1. Applicability of Fair Notice Requirements 
          Because indemnity agreements involve “an extraordinary shifting of risk” from the
exculpated party to the indemnitor, the Texas Supreme Court has developed the fair notice
requirements of express negligence and conspicuousness. Dresser Indus., Inc. v. Page
Petroleum, Inc., 853 S.W.2d 505, 508 (Tex. 1993). The express negligence requirement
provides that when a party is seeking indemnity from the consequences of that party’s own
future negligence, that intent must be expressed in unambiguous terms within the four
corners of the contract. Ethyl Corp. v. Daniel Constr. Co., 725 S.W.2d 705, 708 (Tex.
1987). The conspicuousness requirement provides that something must appear on the
face of the contract indicating the intent to transfer liability so that it will attract the attention
of a reasonable person when he looks at it. Dresser Indus., 853 S.W.2d at 508. Whether
an indemnity clause complies with these fair notice requirements is a question of law for
the court. Id. at 509-10.
          The fair notice requirements apply to indemnity agreements when “the effect . . . is
to relieve a party in advance of responsibility for its own negligence.” Id. at 507 (emphasis
added); see also Solis v. Evans, 951 S.W.2d 44, 50 (Tex. App.–Corpus Christi 1997) ( orig.
proceeding) (noting that a party may not “prospectively contractually exculpate itself with
respect to intentional torts”). However, the fair notice requirements have not been applied
to exculpatory agreements utilized by parties after the transaction or occurrence takes
place. Dresser Indus, 853 S.W.2d at 508 n.1 (“Today’s opinion applies the fair notice
requirements to indemnity agreements and releases only when such exculpatory
agreements are utilized to relieve a party of liability for its own negligence in advance.”).
The application of the fair notice requirements has been “explicitly limited to releases and
indemnity clauses in which one party exculpates itself from its own future negligence.” 
Green Int’l, Inc. v. Solis, 951 S.W.2d 384, 387 (Tex. 1997) (citing Dresser Indus., 853
S.W.2d at 507 & n.1); see Lehmann v. Har-Con Corp., 76 S.W.3d 555, 560 (Tex.
App.–Houston [14th Dist.] 2002, no pet.) (holding that express negligence did not apply to 
release executed after acts giving rise to released liability had occurred); Lexington Ins. Co.
v. W.M. Kellogg Co., 976 S.W.2d 807, 809 (Tex. App–Houston [1st Dist.] 1998, pet.
denied) (holding that fair notice did not apply when release was executed “after the acts
that could give rise to liability were completed”).


 
          In asking us to hold that the Indemnity Agreement is unenforceable as a matter of
law for failure to comply with the fair notice requirements, SEPCO asks us to extend the
reach of “fair notice” to cover indemnity agreements that are used to shift liability for actions
that have already occurred. In the absence of an extraordinary shifting of risk, the supreme
court has “resisted expanding the fair notice requirements.” Storage & Processors, Inc. v.
Reyes, 134 S.W.3d 190, 193 (Tex. 2004). The supreme court has noted that in adopting
the fair notice requirements, it was “concerned with the injustice arising when a contracting
party buries a provision substantially releasing itself from its own negligence in a way that
is inconspicuous and does not provide fair notice to the other party.” Green Int’l, 951
S.W.2d at 387 (discussing Dresser Indus., 853 S.W.2d at 508). The supreme court’s
concerns are not present here. The Indemnity Agreement was executed by two major oil
and gas companies with equal bargaining power after negotiations that specifically
contemplated the adoption of an agreement releasing OXY from liability. Both parties were
fully aware of the risk-shifting nature of the agreement and limited it in scope to liability
arising from a specific series of transactions that had already occurred. We decline to
extend the fair notice requirements.
2. Accrual of Claims 
          SEPCO also contends that not all of Skelly’s claims arose from acts that occurred
prior to the execution of the Indemnity Agreement. Specifically, SEPCO asserts that the
claim for conversion did not arise until Seitel completed the seismic survey and distributed
the licenses, which occurred after the Indemnity Agreement was signed. In their suit
against OXY, the Skelly plaintiffs claimed they “owned an interest and/or were entitled to
possession of such data through a license pursuant to the Seitel Agreement” and that
“OXY unlawfully . . . exercised dominion over the 3-D seismic data to the exclusion of/or
inconsistent with the rights of plaintiffs.” 
          SEPCO argues that the contractual grant of a license in the Seitel Agreement was
merely an intangible right, and therefore, could not be the basis of the conversion claim. 
However, Texas recognizes conversion of intangible property where the underlying
intangible right has been merged into a document and that document has been converted. 
Express One Int’l, Inc. v. Steinbeck, 53 S.W.3d 895, 901(Tex. App.–Dallas 2001, no pet.)
(citing Neles-Jamesbury, Inc. v. Bill’s Valves, 974 F. Supp. 979, 982 (S.D. Tex. 1997)). 
Skelly’s right to a license was not merely an intangible right, but was a right merged into
the Seitel Agreement. Without deciding the merits of Skelly’s conversion claim, we
conclude that the claim arose when the New Bouré Agreement changed the rights that had
been granted in the Seitel Agreement. Thus, the claim for conversion arose on October
16, 1997, when OXY, SEPCO, and Seitel executed the New Bouré Agreement. Because
all claims against OXY arose from actions that occurred prior to the execution of the
indemnification agreement, we conclude the fair notice requirements do not apply.
3. Intentional Torts
          In the alternative, SEPCO contends that because the Indemnity Agreement does
not clearly and specifically state that SEPCO indemnifies OXY for intentional torts, the
contract was not intended to cover, and should not be interpreted to cover, intentional torts.
          If there is no ambiguity, the construction of a contract is a question of law to be
determined by the court. City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d
515, 518 (Tex. 1968). We construe indemnity contracts under the normal rules of contract
construction, with the primary goal of determining the intent of the parties. Assoc. Indem.
Corp. v. CAT Contracting, Inc., 964 S.W.2d 276, 284 (Tex. 1998); ABB Kraftwerke
Aktiengesellschaft v. Brownsville Barge & Crane, 115 S.W.3d 287, 291 (Tex. App.–Corpus
Christi 2003, pet. denied). It is the objective, not subjective, intent of the parties that
controls, and the instrument alone is generally deemed to express that intent. Sun Oil Co.
v. Madeley, 626 S.W.2d 726, 731 (Tex. 1981) (citing City of Pinehurst, 432 S.W.2d at 518).
          It is generally presumed that the parties to an instrument “intend every clause to
have some effect and in some measure to evidence their agreement.” City of Pinehurst,
432 S.W.2d at 518. Provisions are to be read in the context of the instrument as a whole,
not in isolation. Provident Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 216 (Tex.
2003); United Am. Ins. Co. v. Selby, 338 S.W.2d 160, 164 (Tex. 1960); New Braunfels
Factory Outlet Ctr. v. IHOP Realty Corp., 872 S.W.2d 303, 309 (Tex. App.–Austin 1994,
no pet.). Only when we consider all parts of the contract together can we give it the
meaning that will carry out and effectuate the intention of the parties to the fullest extent. 
State Farm Life Ins. Co. v. Beaston, 907 S.W.2d 430, 433 (Tex. 1994); City of Pinehurst,
432 S.W.2d at 519; Smith v. Liddell, 367 S.W.2d 662, 665-66 (Tex. 1963).
          We agree with the parties that the contract is unambiguous. At issue is whether the
parties intended to limit the Indemnity Agreement to cover only specific causes of action. 
The Indemnity Agreement provides, in relevant part, as follows:
WHEREAS, SEPCO and OXY have previously entered into a certain Seismic
and Exploration Agreement . . . concerning the Bouré project . . . for good
and valuable consideration. 
 
WHEREAS, certain individuals and companies, including former SEPCO
employees, who performed services related to . . . the Bouré project, have
allegedly engaged in certain misconduct which may have increased the cost
of these projects and exposed the projects to potential adverse claims by
third parties.
 
* * * * * * *
 
SEPCO and OXY agree that they share a common interest in the
prosecution of [claims against Skelly] and in the defense of any resulting
counterclaims. SEPCO and OXY will fully cooperate with each other in the
prosecution and/or defense of these claims whether or not OXY is a party to
currently pending litigation or any future related litigation.
 
* * * * * * *
 
SEPCO agrees to defend, indemnify, and hold harmless OXY . . . from and
against all costs, expenses, claims, demands, lawsuits, court costs,
attorney’s fees, and judgments directly resulting from claims brought by or
in favor of any individual or entity . . . claiming or purporting to claim any
interest through or derived from SEPCO in those instruments defined as
Seismic Agreements in the Seismic and Exploration Agreement, or in the
Seismic Exploration Agreement itself, as well as all other agreements
acquired by either party, subsequent to March 27, 1997.
 
          The Indemnity Agreement does not expressly limit, nor does it specifically
enumerate, the types of claims to which it applies. The traditional maxim “expressio unius
est exclusio alterius,” the expression of one thing is the exclusion of another, when applied
as a rule of construction, instructs that “the expression in a contract of one or more things
of a class implies the exclusion of all not expressed, even though all would have been
implied had none been expressed.” First Nat’l Bank v. Nugent, 384 S.W.2d 224, 226 (Tex.
App.–San Antonio 1964, writ ref’d n.r.e.) (quoting 17A C.J.S. Contracts, § 312); see CKB
& Assoc., Inc. v. Moore McCormack Petroleum, Inc., 734 S.W.2d 653, 655-56 (Tex. 1987);
Wilson v. Klein, 715 S.W.2d 814, 820 (Tex. App.–Austin 1986, writ ref’d n.r.e.). The maxim
is instructive: had OXY and SEPCO expressly mentioned specific types of claims that
were covered by the indemnity clause, any claim not mentioned would be excluded by
implication. However, because no specific types of claims are mentioned, and there is no
language indicating that limitations were intended, we presume the Indemnity Agreement
applies to all claims. Thus, under general rules of contract construction, intentional torts
are included in the Indemnity Agreement.
          Despite this, SEPCO argues that OXY cannot indemnify itself against liability for
intentional torts because it did not clearly and expressly mention intentional torts in the
Indemnity Agreement. However, SEPCO cites no case mandating such a requirement.


 
While the parties could have included a provision limiting indemnity to specific types of
claims, or specifically excepting intentional torts from coverage, they did not. We will not
rewrite the agreement to “insert provisions [that the] parties could have included or to imply
restraints for which they have not bargained.” Tenneco, Inc. v. Enter. Prod. Co., 925
S.W.2d 640, 646 (Tex. 1996) (citing Dorroh-Kelly Mercantile Co. v. Orient Ins. Co., 104
Tex. 199, 135 S.W. 1165 (Tex. 1911)). Accordingly, we conclude that the Indemnity
Agreement applies to intentional tort claims. OXY’s first issue is sustained.
D. Public Policy
          In its second issue, OXY asserts that the Indemnity Agreement does not violate
Texas public policy. SEPCO argues that any agreement indemnifying a party for its own
intentional torts is unenforceable as against Texas public policy. 
          While the supreme court has noted that indemnity against one’s own intentional
torts does raise public policy concerns, it has not held that such indemnity agreements are
prohibited. Atl. Richfield Co. v. Petroleum Pers., Inc., 768 S.W.2d 724, 726 n.2 (Tex.
1989). In cases where a party has contracted to indemnify itself against its own future
negligence, the supreme court has held that it does not violate public policy, Allright, Inc.
v. Elledge, 515 S.W.2d 266, 267 (Tex. 1974); Ohio Oil Co. v. Smith, 365 S.W.2d 621, 624
(Tex. 1963), except where there is a disparity of bargaining power such that one party is
so disadvantaged that it is essentially forced to agree to the exculpatory provision. Allright,
Inc., 515 S.W.2d at 267 (holding that parking lot owner did not have sufficiently dominant
relationship over vehicle owners for public policy to prevent enforcement of agreement
limiting liability); Crowell v. Hous. Auth. of Dallas, 495 S.W.2d 887, 889 (Tex. 1973)
(holding it to be contrary to public policy for housing authority to exempt itself from liability
to its own tenants); Valero Energy Corp. v. M.W. Kellogg Constr. Co., 866 S.W.2d 252, 256
(Tex. App.–Corpus Christi 1993, pet. denied) (holding that enforcement of indemnity
provision for gross negligence does not offend public policy when parties are sophisticated
entities bargaining from positions of substantially equal strength).
          SEPCO argues that because intentional torts have a higher culpable mental state
than negligence claims, the shifting of liability evokes greater risk to the indemnitor and a
greater public policy concern. SEPCO encourages us to consider insurance industry
cases, which have held that a party cannot insure itself against its own intentional torts
under the public policy rationale that “an insured is more likely to engage in behavior which
is harmful to society if he believes he will not have to bear the financial costs of his
intentional indiscretions.” Wessinger v. Fire Ins. Exch., 949 S.W.2d 834, 840 (Tex.
App.–Dallas 1997, no writ). SEPCO argues that allowing a party to indemnify itself against
an intentional tort would allow it to create harm or injury to others with no risk of liability. 
We find SEPCO’s argument unconvincing in these circumstances.
          We find the public policy argument of deterring misconduct by preventing a party
from contracting away liability to be inapplicable in this case because the Indemnity
Agreement is limited to actions that have already occurred. The public policy goal is
especially inapplicable because the Indemnity Agreement acknowledges that part of the
rationale underlying its adoption lies in the misconduct of the indemnitor. After
acknowledging that SEPCO’s own misconduct exposed the Bouré project, and all parties
involved, to litigation, SEPCO agreed to indemnify OXY against any potential claims
stemming from OXY’s continued participation, in order to secure that participation. Public
policy would not be served by allowing SEPCO to induce OXY to forgo a breach of contract
claim and renegotiate based upon a promise of indemnity, and then disavow that
indemnity. OXY would not be exposed to any liability were it not for the initial misconduct
of SEPCO. 
          We conclude that public policy does not prohibit the enforcement of the Indemnity
Agreement between SEPCO and OXY. OXY’s second issue is sustained.
E. Claims Covered
          In its third issue, OXY contends that Skelly’s claims against it are covered by the
Indemnity Agreement. SEPCO argues that Skelly’s claims are not based on interests
derived through or from SEPCO in any agreement covered by the Indemnity Agreement.
          In the Indemnity Agreement, SEPCO agreed to indemnify OXY against “all costs,
expenses, claims, demands, lawsuits, . . . and judgments resulting from claims brought by
. . . any individual or entity [not a part of the indemnity agreement] claiming . . . any interest
through or derived from SEPCO in” (1) the instruments defined in the SEA as “Seismic
Agreements,” (2) the SEA itself, and (3) all other agreements acquired by either party
subsequent to March 27, 1997. The SEA defines “Seismic Agreements” as “oil, gas and
mineral leases or subleases; permits and/or options to acquire oil, gas, and mineral leases
from the owners of the land; and/or mineral rights or mineral leases under the AMI, any of
which permit the conducting of a seismic survey program as described in Article V hereof.” 
          In its amended pleading, Skelly included claims against OXY for (1) tortious
interference with contractual and business relations, (2) conversion, and (3) abuse of
rights. Skelly’s claims stem from asserted contractual interests in both the Skelly Letter
Agreement and the Seitel Agreement, and an ownership or possessory interest in the
three-dimensional seismic data through a license under the Seitel Agreement. In deciding
whether Skelly’s claims are covered by the Indemnity Agreement, we must determine
whether each of these interests constitutes “interest[s] through or derived from SEPCO”
as those terms were intended by the parties to the contract.
1. The Skelly Letter Agreement
          The Skelly Letter Agreement is a letter agreement dated December 16, 1996,
between Skelly and SEPCO. The agreement notes that Skelly had generated a three-dimensional seismic area of mutual interest, and provided that SEPCO and Skelly would
jointly market the three-dimensional seismic program for the Bouré project. SEPCO would
receive a twenty-five percent carried interest in all permits, options, leases, data processing
and a standard license to one hundred percent of the seismic data; with any additional
promoted interest or promoted cash to be owned and retained by Skelly.
          SEPCO contends that the Skelly Letter Agreement is not a “Seismic Agreement.” 
However, SEPCO fails to state a basis for that contention. We conclude that the Skelly
Letter Agreement anticipates the conducting of a seismic survey program and the division
of permits, options, and leases acquired in relation to that survey. Accordingly, we hold it
is a “Seismic Agreement,” as that term was defined in the SEA.
          Prior to the Skelly Letter Agreement, SEPCO had contracted and obtained
permission to conduct seismic surveys in the area later to become the Bouré project.


 In
the Skelly Letter Agreement, SEPCO agreed to bring Skelly into the project to acquire and
market the seismic data. Thus, Skelly’s interests as defined in the Skelly Letter Agreement
were “interest[s] through or derived from SEPCO.” 
          Because the Skelly Letter Agreement is considered a “Seismic Agreement” in
accordance with the Indemnity Agreement, and confers an interest to Skelly through
SEPCO, we hold that Skelly’s claims based on rights stemming from the Skelly Letter
Agreement are covered by the indemnity contract between SEPCO and OXY.
2. The Seitel Agreement 
          SEPCO contends that Skelly’s right to receive a license under the Seitel Agreement
is not derived from SEPCO, but is an independent claim not covered by the Indemnity
Agreement. The Seitel Agreement is an April 29, 1997 letter agreement between SEPCO
and Seitel, confirming certain details of the parties’ participation in the Bouré project. 
          The Seitel Agreement required SEPCO to purchase up to four licenses to the
seismic data. In the agreement, SEPCO designated Skelly as the recipient of one of the
licenses. Skelly’s ownership/possessory interest in the three-dimensional seismic data was
based on this license. Skelly only had a right to acquire this license because SEPCO
contracted to purchase a license for the benefit of Skelly. Thus, Skelly’s right to a license
to the seismic data under the Seitel Agreement is an “interest through or derived from
SEPCO.” Further, because the Seitel Agreement constitutes “an agreement acquired
subsequent to March 27, 1997,” Skelly’s claims based on rights stemming from the Seitel
Agreement are covered by the indemnity contract between SEPCO and OXY.
          We hold that all claims brought against OXY by Skelly directly result from a claimed
interest derived from or through SEPCO and are, therefore, covered by the Indemnity
Agreement. OXY’s third issue is sustained.
F. OXY’s Assignment of Bouré Interests
          In its fourth issue, OXY contends that when it assigned its interests in the Bouré
project to Petro-Hunt, L.L.C., it specifically reserved its rights under the Indemnity
Agreement. In April 1998, OXY executed a Conveyance and Assumption Agreement,
conveying to Petro-Hunt, L.L.C., certain assets, including OXY’s rights and interests in the
SEA and in a September 8, 1997 agreement between OXY and Seitel. SEPCO asserts
that because at the time of the assignment there was no judgment or settlement against
OXY, there was only a potential cause of action and no existing right to indemnity to be
reserved.
          The rights reserved by OXY are much broader than SEPCO asserts. OXY
specifically excepted and reserved “all rights relating to . . . existing claims and causes of
action . . . , including without limitation rights under that certain Joint Prosecution and
Indemnification Agreement . . . .” At the time of the assignment, all of the operative facts
giving rise to the eventual suit against OXY had occurred. The right to indemnity is a right
relating to those existing claims. We conclude that OXY retained its right to be indemnified
under the Indemnity Agreement. OXY’s fourth issue is sustained.
G. Conclusion 
          We reverse the orders of the trial court granting SEPCO’s motion for summary
judgment and denying OXY’s motion for summary judgment. Because we hold that the
Indemnity Agreement is enforceable against SEPCO and covers all claims in question, we
render judgment denying SEPCO’s motion for summary judgment and granting OXY’s
motion for summary judgment.


                                                                           FEDERICO G. HINOJOSA
                                                                           Justice


Opinion delivered and filed this
the 14th day of April, 2005.