

## NUMBER 13-08-00589-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA
AND INDUSTRIAL RISK INSURERS,                                  Appellants,

v.

JOHN ZINK COMPANY; FISHER
CONTROLS COMPANY, INC.; FISHER
CONTROLS INTERNATIONAL, INC.;
FISHER CONTROLS INSTALLATION AND
SERVICE COMPANY; AND VALTEK, INC.,                            Appellees.

On appeal from the 117th District Court
of Nueces County, Texas.

## MEMORANDUM OPINION

**Before Justices Yañez, Garza and Benavides**
**Memorandum Opinion by Justice Benavides**

This litigation arises out of an explosion that occurred in 1984 and a fire that

occurred in 1985 at a refinery operated by Valero Energy Corporation ("Valero") in Corpus

Christi, Texas. Appellants, National Union Fire Insurance Company of Pittsburgh, PA and Industrial Risk Insurers (collectively "the Insurers"), appeal the trial court's order granting final summary judgment in favor of appellees, John Zink Company ("Zink"), Valtek, Inc., and three entities we will collectively refer to as "Fisher": Fisher Controls Company, Inc., Fisher Controls International, Inc., and Fisher Controls Installation and Service Company (collectively the "Contractors"). By a single issue, which includes numerous subparts, the Insurers argue that the trial court erred in granting all the Contractors' motions for traditional summary judgment on their affirmative defenses of release and waiver of liability arising from a contract between Valero and M.W. Kellogg Construction Company ("Kellogg"). The Insurers' arguments can be generally summarized as follows: (1) the Contractors are not "subcontractors" as required by the release and waiver provisions; (2) if the Contractors are subcontractors, the release and waiver provisions are invalid under the express negligence doctrine; (3) the release and waiver provisions do not apply to claims based on the previously signed purchase orders and, in any event, are invalid under the Texas Deceptive Trade Practices Act ("DTPA") provisions in effect at the time of the purchase orders; (4) if the release and waiver provisions are valid, they are limited, and therefore, the trial court erred by granting final summary judgment; and (5) various preclusion doctrines do not bind this Court to its prior rulings in related appellate decisions. We affirm.

## I. BACKGROUND

This litigation, in various forms and fashions with different parties at times, has been reviewed by this Court on three different occasions. *See generally Valero Energy Corp. v. M.W. Kellogg Constr. Co.*, 866 S.W.2d 252 (Tex. App.–Corpus Christi 1993, writ denied) (*Valero*); *Nat'l Union Fire Ins. Co. v. John Zink Co.*, 972 S.W.2d 839 (Tex. App.–Corpus

Christi 1998, pet. denied) (*Nat'l Union I*); *Nat'l Union Fire Ins. Co. v. John Zink Co.*, No. 13-02-00446-CV, 2005 WL 608229 (Tex. App.–Corpus Christi Mar. 17, 2005, pet. denied) (mem. op.) (*Nat'l Union II*).  We will begin by describing the relationship of the parties and the underlying events leading to litigation.  We will then discuss the procedural history, including *Valero, Nat'l Union I,* and *Nat'l Union II.*  Finally, we will discuss the proceedings leading to the instant appeal and the parties' arguments.

**A.**     ***Valero***

In July 1979, Saber Energy, Inc. (now Valero) began negotiating with Kellogg for construction, engineering, and design services related to a $500 million expansion of Valero's Corpus Christi oil refinery.  *Valero,* 866 S.W.2d at 254.   Kellogg engaged subcontractors and began construction on the project on October 15, 1980, but the final contract between Valero and Kellogg was not executed until May 28, 1982 (the "Valero/Kellogg contract").  *Id.*  The Valero/Kellogg contract was made retroactive to October 15, 1980, when construction began.  *Id.* at 257.

The Valero/Kellogg contract provided for certain releases, waivers, and indemnity between the parties and for various types of insurance coverage:

>  6.2    [Kellogg][1] shall provide the following insurance:
>
>         . . . .
>
>         (b).    Comprehensive General Liability Insurance (including Contractual Liability, Contractor's Contingent Liability and Explosion, Collapse and Underground Damage) covering Bodily Injury and Property Damage with a Combined Single Limit of $2,000,000 per occurrence. . . . [Kellogg's] liability with respect to [Valero's] property so covered shall be limited to the amount of such insurance.

---

[1] The contract refers to Kellogg as "Contractor" and Valero as "Owner."  The term "Contractor" does not include Kellogg's subcontractors in its definition within the contract.

3

. . . .

6.3 [Kellogg's] subcontractors will be required to carry insurance of the types described in . . . paragraph 6.2 above, as appropriate, at limits considered adequate in accordance with [Kellogg's] standard subcontract procedures.

. . . .

6.7 [Kellogg] agrees that it will defend, indemnify, and hold [Valero] harmless against all claims, liability, loss and expense including legal fees and court costs in connection therewith, arising out of this agreement or the work to be performed hereunder, to the extent [Kellogg] is compensated by insurance required by this Agreement.

6.8 [Valero] shall release, defend, indemnify and hold harmless [Kellogg], its subcontractors and affiliates and their employees performing services under this Agreement against all claims, liabilities, loss or expense, including legal fees and court costs in connection therewith, arising out of or in connection with this Agreement or the Work to be performed hereunder, including losses attributable to [Kellogg's] negligence, to the extent [Kellogg] is not compensated by insurance carried under this ARTICLE. [Valero] shall obtain for the benefit of [Kellogg], its subcontractors and affiliates and their employees, waiver of subrogation rights under all its applicable insurance policies.

6.9 Neither [Kellogg] nor its affiliates nor its subcontractors or vendors, either individually or jointly shall be liable to [Valero] or its affiliates, irrespective of whether alleged to be due to negligence or otherwise, for loss of anticipated or non-operation of the Plant or other equipment, for loss of catalysts or chemicals or for any consequential or special loss or damage arising from any reason whatsoever.

The Insurers allege that on July 13, 1984, a vertical air preheater exploded and caused damage to the plant. *Nat'l Union I*, 972 S.W.2d at 841. On May 27, 1985, a fire occurred in a citrate scrubber stack at the Corpus Christi Valero plant. *Id.*

As noted above, part of the discussions prior to the Valero/Kellogg contract involved negotiations for mutual insurance coverage for events at the refinery. *Nat'l Union I,* 972 S.W.2d at 841. Valero's Insurers, appellants in this case, paid insurance benefits to Valero for the claims arising from the citrate scrubber stack fire. *Id.*

4

Valero brought a lawsuit against Kellogg and Ingersoll-Rand. *Valero*, 866 S.W.2d at 254. Additionally, the Insurers brought two lawsuits against the Contractors[2] and also intervened in Valero's lawsuit. *Nat'l Union I*, 972 S.W.2d at 842. All of these cases were then consolidated. *Id.*

Against the Contractors, the Insurers alleged subrogation claims for products liability and negligence related to the manufacture and installation of the products, breach of contract, and breach of an agreement to indemnify Valero through insurance obtained to cover the alleged losses. *See id.* Additionally, the Insurers alleged that the Contractors breached a fiduciary duty, breached a duty of good faith and fair dealing, and violated the Texas Insurance Code and the DTPA by failing to procure insurance. *Id.*

Kellogg and Ingersoll-Rand filed traditional motions for summary judgment based on the waiver and release provisions in the Valero/Kellogg contract quoted above. *Valero*, 866 S.W.2d at 254. After the motions were filed, Valero amended its petition to assert various defenses to the waiver and release provisions, including fraud, unconscionability, duress, unenforceability, and public policy. *Id.* Valero filed a motion for partial summary judgment based on this amended pleading, but as a sanction, the trial court struck all pleadings, affidavits, and exhibits with respect to the defenses of fraud, unconscionability, duress, and adhesion. *Id.* The trial court then granted Kellogg and Ingersoll-Rand's motions for summary judgment and denied Valero's motion for partial summary judgment. *Id.* The Insurers' claims were severed into a separate lawsuit, which became the basis for *Nat'l Union I*, and the severed suit was abated pending Valero's appeal of the summary judgments. *Nat'l Union I*, 972 S.W.2d at 842.

---

[2] The Insurers also sued Puffer Sweiven, Inc., Puffer-Sweiven Trading Corporation, and Puffer-Sweiven Texas, Inc., who are not parties to this appeal.

5

On appeal, we initially upheld the sanctions against Valero. *See Valero*, 866 S.W.2d at 255-56. We then addressed the summary judgment rulings. *Id.* at 256. First, we rejected Valero's defenses to enforcement of the waiver and release provisions of the contract, holding that the provisions did not violate public policy and that the parties validly bargained for the provisions. *Id.* at 257-58.

Second, we held that Ingersoll-Rand was also entitled to protection under the waiver and release provisions as Kellogg's subcontractor:

> Similarly, Ingersoll-Rand, as one of Kellogg's subcontractors, is also addressed in the Valero/Kellogg contract as an entity entitled to protection under the waiver and hold-harmless clauses. As such, it, too is held harmless as [and] is indemnified under the contract fairly negotiated between Kellogg and Valero.

*Id.* at 258. Finally, we rejected Valero's argument that it did not validly waive its claims under the DTPA, which required us to determine which version of the Act applied to the claims. *Id.* at 258-59. Because we rejected all of Valero's arguments on appeal, we affirmed the summary judgment in favor of Kellogg and Ingersoll-Rand. *Id.* at 259.

## B.    *Nat'l Union I*

After *Valero*, the trial court allowed the Insurers to proceed against the Contractors. *Nat'l Union I*, 972 S.W.2d at 842. The Contractors filed motions for summary judgment, claiming that the Insurers' "wholly derivative claims had been eliminated when [this Court] found in *Valero* that, under the terms of the contract, Valero had waived all of its claims against Kellogg and its subcontractors." *Id.* Additionally, the Contractors argued that the Insurers were bound by *Valero* under the "law of the case" doctrine; specifically, the Contractors argued that, because we previously found that Valero waived all its claims against Kellogg's subcontractors under the Valero/Kellogg contract, the Insurers had no claims against the Contractors. *Id.* The trial court granted the motions for summary

6

judgment.  *Id.* at 841.

On appeal, we agreed with the Contractors that the Insurers' claims were wholly derivative of Valero's claims.  *Id.* at 843.  Thus, we concluded that we needed to "review our holding in *Valero* and the motions for summary judgment in that case" to "adequately assess [the Contractors'] wholly derivative argument."  *Id.* at 844.  We noted that in *Valero*, Kellogg and Ingersoll-Rand "moved for summary judgment on the ground that, under the terms of the contract, Valero had agreed to exculpate and indemnify Kellogg and its subcontractors for any liabilities."  *Id.* (footnote omitted).  We referred to sections 6.8 and 6.9 of the Valero/Kellogg contract.  *Id.*  We noted, however, that Kellogg's motion for summary judgment in *Valero* also stated that "[u]nder the [Valero/Kellogg contract], insurance was established as the exclusive remedy for any liability."  *Id.*  Thus, we reviewed sections 6.2(b), 6.3, and 6.7 of the contract.  *Id*.  We further noted that the Contractors did not assert in their motion for summary judgment that Valero waived its insurance claims or that Valero was asserting insurance claims in its lawsuit.  *Id.*  Thus, we held that the Contractors read *Valero* too broadly:

> In [*Valero*], we were asked to consider whether Valero contractually waived its claims for gross negligence and products liability.  Specifically, Valero argued that a waiver of gross negligence claims offended public policy and that a general waiver of liability was not sufficient to waive products liability causes of action.  After setting forth section 6.8 of the contract, stating that Valero held harmless Kellogg and its subcontractors "against all claims . . . to the extent CONTRACTOR is not compensated by insurance[,]" we held that  Kellogg and Ingersoll-Rand were absolved "of all liability sounding in products liability and gross negligence."

> Nowhere in the opinion did we specifically hold that all of Valero's liability claims were waived by the contract.  Moreover, we could not so hold because Valero's insurance claims were not expressly addressed by the motion for summary judgment and, therefore, were not before the trial court or this Court.  To the extent that [*Valero*] may be interpreted to hold that all of Valero's claims were waived by the contract, we hold that the waiver must be limited because of our reliance on sections 6.8 and 6.9 of the agreement.

In other words, Valero agreed to absolve Kellogg and its subcontractors of liability for claims to the extent the contractor was not compensated by insurance and for those losses specified in section 6.9.

Although the Insurers' claims are wholly derivative of Valero's, they seek recovery for insurance claims Valero may have against [the Contractors]. As is evidenced from contract provisions 6.2, 6.3, and 6.7, the contract required liability insurance and regulated its applicability. Whether Valero has insurance claims against [the Contractors], subrogation rights, and [the Contractors'] status under the terms of the contract are some issues that have not been addressed by any motion for summary judgment. Thus, if the trial court granted summary judgment in favor of [the Contractors] on the ground that, pursuant to [Valero], all of the Insurers' wholly derivative claims were waived by the terms of the contract, we conclude the court committed error.

Id. at 845 (citations omitted). Thus, we held that Valero did not preclude the Insurers from asserting insurance claims against the Contractors because that issue was not before us in Valero. Id.

Next, we addressed the Contractors' argument that Valero was the law of the case, which we noted "essentially reassert[ed] the arguments expressed in the first ground." Id. We explained that the law-of-the-case doctrine "does not necessarily apply if the issues and facts are not substantially the same in the subsequent trial." Id. We then held that Nat'l Union I was not the "same case as or a subsequent stage of Valero, nor [were] the issues the same." Id. Thus, we held that if the trial court based its summary judgment on the law-of-the-case doctrine, it was in error. Id.

We further held that res judicata and collateral estoppel did not bar litigation of the issues involved in Nat'l Union I:

The motion for summary judgment in [Valero] was filed by the defendants, Kellogg and Ingersoll-Rand, who agreed that the Insurers' claims were not a part of the motion. [The Contractors] apparently did not object to the agreement and were not parties to the motion. Thus, the present parties were not cast as adversaries in the previous summary judgment. In addition, the liability facts in this case have never been fully

8

litigated, nor were those facts essential to the summary judgment in [*Valero*]. Moreover, the issue of whether insurance claims exist under the terms of the contract was not litigated. If the trial court granted summary judgment in favor of [the Contractors] on the grounds of *res judicata* or collateral estoppel, we conclude the court committed error.

*Id.* at 846.

After rejecting limitations and judicial estoppel arguments made by the Contractors, we turned to Zink's arguments specific to the claims against it. *Id.* at 847. Zink argued that it was entitled to summary judgment under a contract it had with Kellogg. *Id.* We noted that Zink's motion reiterated that the Insurers' claims can be no greater than Valero's, and that the motion stated: "Valero's claims, which have been dismissed with prejudice as to John Zink, were for consequential damages, and the Kellogg/John Zink agreement expressly states that John Zink shall not be liable for such consequential damages." *Id.* We explained that Zink relied on a purchase order, bearing Zink's "Standard Terms of Sale," and that it appeared to exclude Zink's liability for consequential damages. *Id.* However, we found no evidence that Valero was bound to that agreement or that Valero's claims against Zink were dismissed because of that agreement because "the motion for dismissal and the dismissal order [were] neither attached to nor referenced in the motion for summary judgment." *Id.* Thus, Zink failed to establish that the Insurers were bound by that agreement, and the trial court erred to the extent it granted summary judgment on that ground. *Id.* Because we sustained the Insurers' issues, we reversed the summary judgments and remanded. *Id.* at 848. The Texas Supreme Court denied review.

## C. *Nat'l Union II*

On remand after *Nat'l Union I*, the Contractors filed another round of traditional motions for summary judgment, which the trial court again granted. *Nat'l Union II*, 2005

9

WL 608229, at *1.  On appeal, we summarized the status of the litigation up to that point:

> The previous decision from this Court stemming from the same underlying litigation, [*Nat'l Union I*], held that because Valero's insurance claims against [the Contractors] were not expressly addressed by [the Contractors]' motions for summary judgment, the trial court erred by granting complete relief to [the Contractors].  In particular, [the Contractors] had failed to explain whether [the Insurers] had asserted any independent claims against them apart from their liability to Valero, whether they should be treated as sub-contractors under the Valero-Kellogg contract, and why the waiver of liability in the Valero-Kellogg contract should trump the individual waivers of liability in the Zink and Fisher purchase orders.  In response, [the Contractors] amended and re-asserted their motions for summary judgment, this time addressing Valero's insurance claims, subrogation rights and status under the terms of the contract.  The trial court subsequently granted these motions.
>
> [The Insurers'] seventh amended petition does not assert independent claims that arise from [the Insurers'] own status, but rather only asserts that [the Contractors] breached duties owed to Valero, which they now assert on Valero's behalf as its insurers.  Therefore, we can appropriately apply the previous decisions from this Court that address the liability of Valero under its contract with Kellogg.

*Id.* at *3.

The Insurers first argued that the summary judgment failed to address claims against Zink and Fisher[3] that were raised in their seventh amended petition, which was filed after the Contractors moved for summary judgment.  *Id.* at *2.  Specifically, the Insurers added claims for breach of contract and breach of guarantees and warranties against Zink and claims for breach of guarantees and warranties and reformation against Fisher.  *Id.*  We held that the trial court erred to the extent it granted summary judgment on the newly-filed claims, as those claims were not properly before it as part of the summary judgment proceeding.  *Id.*  Thus, we reversed and remanded as to those claims.

---

[3] We noted that the late-added claims were not asserted against Valtek.  *Nat'l Union Fire Ins. Co. v. John Zink Co.*, No. 13-02-00446-CV, 2005 WL 608229, at *2 n.2 (Tex. App.–Corpus Christi Mar. 17, 2005, pet. denied) (mem. op.) (*Nat'l Union II*).

10

*Id.*

Next, we noted that the Insurers claimed negligence, products liability, and breach of contract. *Id.* at *4. We addressed the Insurers' argument that the Contractors never provided evidence that they were Kellogg's "subcontractors" and, therefore, entitled to assert affirmative defenses arising from the Valero/Kellogg contract. *Id.* We referred to sections 6.8 and 6.9 of the Valero/Kellogg contract, which we noted "on [their] face absolve[] Kellogg and its sub-contractors from all liability against 'all claims' beyond what is covered by Kellogg's own insurance." *Id.* After quoting at length from *Valero*, we held that "the issue of sub-contractor liability under the Valero-Kellogg contract has been previously decided by this Court." *Id.* We held that because the Insurers' claims were derivative of Valero's claims against Kellogg's subcontractors, the Insurers were estopped from asserting the claims that Valero validly waived in its contract with Kellogg. *Id.* We held that the only remaining issue was whether the Contractors had proved that they were "subcontractors" entitled to the benefit of the release and waiver provisions. *Id.*

Initially, we defined "subcontractor" as "a party who takes and performs a portion of a contract from a principal contractor or who enters into a contract for the performance of an act with a person who has already contracted for its performance." *Id.* at *5. We then held that Zink provided substantial documentation establishing its subcontractor status, including "its bid to provide the air heater, and Kellogg's subsequent acceptance of the bid in a purchase order." *Id.* We likewise found that Fisher provided substantial evidence, including: an "inquiry" from Kellogg regarding the computer control system, a bid from Fisher in response, and acceptance of the bid from Kellogg in the form of a purchase order. *Id.* We opined that the evidence established that Zink and Fisher contracted with

11

Kellogg to perform work that Kellogg had already contracted to perform for Valero, bringing both within the definition of a subcontractor. *Id.* Thus, we held that the trial court did not err by granting Zink and Fisher's motion for summary judgment on these grounds. *Id.*

The Insurers rejoined by arguing that Zink and Fisher were liable to Kellogg and Valero for a breach of warranties and guarantees in their purchase orders, signed in June 1981 before the Valero/Kellogg contract was finalized, which stated that they would "defend and hold [Kellogg and Valero] harmless . . . . for loss of and/or damage to property caused in whole or in party [sic] by the negligence or willful acts of [Zink and Fisher] in connection with the Materials furnished hereunder, including without limitation, the installation, erection, repair, adjustment or operation thereof." *Id.* We rejected this argument, stating that the later-signed Valero/Kellogg contract was a valid, integrated agreement which preempted the prior, inconsistent purchase orders under the parol evidence rule. *Id.*

We then turned to Valtek's evidence. *Id.* at *6. We held that Valtek had not raised its subcontractor status as a ground for summary judgment:

> The evidence Valtek produced in support of its motion for summary judgment focuses only on the testing and reliability of the valve involved in the refinery incidents. Valtek is seeking to absolve itself of liability by demonstrating not that it was a subcontractor but rather that it was not negligent and its valve was not defective. In all of Valtek's summary judgment evidence, Kellogg is only mentioned in a reply to an interrogatory from [the Insurers]: "the valve met the requirements supplied by [Kellogg] for the designated service." The other [Contractors] provided signed agreements, invoices and purchase orders demonstrating an offer and acceptance occurred between themselves and Kellogg. Valtek, beyond bare assertions in its motion for summary judgment, did not provide any evidence to indicate that it had a business relationship with Kellogg such that it could be considered Kellogg's subcontractor for purposes of the Valero-Kellogg project.

*Id.* Thus, we held that Valtek did not prove that it was entitled to rely on the waiver

12

provisions in the Valero/Kellogg contract, and we reversed the trial court's summary judgment in Valtek's favor. In sum, we affirmed the summary judgment as to Zink and Fisher, except with respect to the claims added after the motions for summary judgment were filed, and we reversed the summary judgment as to Valtek. *Id.* The Texas Supreme Court again denied review.

## D. On Remand After *Nat'l Union II*

On remand, the Insurers filed their tenth amended petition, in which they alleged the following claims against the Contractors: (1) breach of the Fisher/Kellogg purchase order; (2) breach of contract-based warranties arising out of the Fisher/Kellogg purchase order; (3) breach of pre-sale implied warranties; (4) breach of the duty to adequately warn and instruct; (4) products liability; (5) post-sale negligent misrepresentation; (6) breach of post-sale implied warranties; (7) negligence; (8) gross negligence; (9) DTPA violations; and (10) breach of the Valero/Kellogg contract.

The Contractors again moved for final summary judgment on the claims. Fisher moved for summary judgment, and filed an amended motion for summary judgment, arguing that all of the Insurers' claims were barred by the waiver and release provisions in the Valero/Kellogg contract and by this Court's prior decisions. Initially, Fisher argued that some of the claims pleaded in the Insurers' tenth amended petition were previously adjudicated by this Court in *Nat'l Union II* but had nevertheless been repleaded by the Insurers.[4] Nevertheless, Fisher argued that all of the Insurers' claims failed as a matter of

---

[4] Specifically, Fisher argued that this Court's affirmance of the summary judgment in *Nat'l Union II* precluded the Insurers from re-asserting the following claims: (1) negligence; (2) gross negligence; (3) products defect/liability; (4) misrepresentations; (5) breach of implied warranties; (6) breach of the duty to adequately warn and instruct; (7) breach of sections 6.2(b), 6.3, and 6.7 of the Valero/Kellogg contract; (8) breach of article 21.21 of the Texas Insurance Code; and (9) DTPA violations.

13

law under the law-of-the-case doctrine and *Nat'l Union II* because: (1) Valero expressly released and waived any and all claims against Kellogg's subcontractors, including Fisher, when it executed the Valero/Kellogg contract; (2) Fisher was Kellogg's subcontractor in the Valero refinery expansion project; (3) as Valero's subrogees, the Insurers are bound by Valero's release; (4) the liability provisions contained within the Fisher subcontract with Kellogg were preempted and waived by Valero when it subsequently executed the Valero/Kellogg contract; and (5) the trial court did not err when it granted Fisher's summary judgment on the claims raised in the Insurers' sixth amended petition, as decided by *Nat'l Union II*. Fisher again submitted the same evidence it presented in the prior, affirmed summary judgment proceeding and argued that, as in *Nat'l Union II*, this evidence conclusively established that Fisher was Kellogg's subcontractor, entitling Fisher to rely on the release and waiver provision in the Valero/Kellogg contract as a defense to all the Insurers' claims. Finally, Fisher argued that, as this Court held in *Valero*, Valero's waiver of DTPA claims was valid. Zink also filed a new motion for summary judgment on remand, followed by an amended motion for summary judgment, making the same arguments as Fisher and also attaching the same evidence upon which it had previously relied to show its subcontractor status.

Valtek also filed a motion for summary judgment, followed by a supplemental motion for summary judgment, arguing that it was a subcontractor entitled to the waiver and release provisions in the Valero/Kellogg contract. In support, Valtek submitted evidence showing that Kellogg submitted an inquiry to Valtek regarding expander bypass valves it manufactured. On August 14, 1981, Valtek submitted to Kellogg a proposal for the valves, noting that it was bidding in accordance with Kellogg's specifications. On that same day,

14

Valtek also issued a bid and quote to Kellogg. On September 23, 1981, Valtek agreed to Kellogg's terms and conditions and continued corresponding with Kellogg regarding the valve specifications. Kellogg then issued a purchase order to Valtek on November 16, 1981. On December 4, 1981, Valtek prepared a certified valve order. Valtek argued that this evidence was identical to that submitted by Fisher and Zink, which was found by this Court in *Nat'l Union II* to conclusively establish subcontractor status and entitlement to the release and waiver provisions in the Valero/Kellogg contract.

The Insurers responded to the Contractors' motions for summary judgment and also filed a motion for partial summary judgment on the Contractors' affirmative defenses, arguing that their claims were not barred by the law-of-the-case doctrine, res judicata, or collateral estoppel. Next, the Insurers argued that the Contractors were not "subcontractors" entitled to rely on the release and waiver provisions in the Valero/Kellogg contract because: (1) the evidence established that the Contractors were merely sellers or vendors and did not perform services, as required by the contract to be considered subcontractors; (2) the Valero/Kellogg contract allowed Kellogg to hire subcontractors only with Valero's consent, and there was no evidence that Valero consented; and (3) the Valero/Kellogg contract required subcontractors to purchase insurance, and there was no evidence that the Contractors purchased such insurance.

In the alternative, the Insurers argued that, even if the Contractors could be considered "subcontractors," the release and waiver was invalid because it did not satisfy the "express negligence" test. Furthermore, the Insurers argued that some of their claims were based on the Contractors' purchase orders with Kellogg, which were independently viable and which required the Contractors to compensate Valero "for loss of and/or

15

damage to property caused in whole or in part by the negligence or willful acts of [the Contractors] in connection with the materials furnished hereunder, including without limitation, the installation, erection, repair, adjustment or operation thereof." Additionally, the Insurers claimed that the DTPA in effect at the time of the purchase orders did not allow a consumer to waive its rights; thus, the DTPA claims arising from the purchase orders had not been validly waived. Finally, the Insurers argued that there was no evidence that the Insurers' claims exceeded the limits of Kellogg's insurance policies, which was a necessary precondition to the release and waiver provisions.

The trial court again granted the Contractors' motions for final summary judgment and denied the Insurers' motion for partial summary judgment. This appeal ensued.

## II. STANDARD OF REVIEW

The trial court's order granting the Contractors' motion for summary judgment did not state the grounds for its rulings. Under these circumstances, we must affirm the judgment if any of the grounds alleged in the motions were meritorious. *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005). We review the trial court's grant of a traditional motion for summary judgment de novo. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003); *Branton v. Wood*, 100 S.W.3d 645, 646 (Tex. App.–Corpus Christi 2003, no pet.). When reviewing a traditional summary judgment, we must determine whether the movant met its burden to establish that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). The movant bears the burden of proof in a traditional motion for summary judgment, and all doubts about the

16

existence of a genuine issue of material fact are resolved against the movant. *See Sw. Elec. Power Co.*, 73 S.W.3d at 215. We take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

We will affirm a traditional summary judgment only if the record establishes that the movant has conclusively proved its defense as a matter of law or if the movant has negated at least one essential element of the plaintiff's cause of action. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004); *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997); *Clear Creek Basin*, 589 S.W.2d at 678. A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). Only when the movant has produced sufficient evidence to establish its right to summary judgment does the burden shift to the plaintiff to come forward with competent controverting evidence raising a genuine issue of material fact with regard to the element challenged by the defendant. *Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999); *see Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995).

### III. SUBCONTRACTOR STATUS

The Insurers argue that the Contractors do not qualify as "subcontractors" under the Valero/Kellogg contract and, therefore, are not entitled to rely on the release and waiver provisions, for the following reasons: (1) the "law of the case" doctrine does not preclude this Court from revisiting our prior holdings and, in any event, does not apply to the claims that survived *Nat'l Union II* and that were newly pleaded on remand; (2) Fisher's evidence does not show a contract with Kellogg or distinguish between the three Fisher entities in

17

a manner that shows exactly which Fisher companies contracted with Kellogg, if any; (3) the evidence established that the Contractors were merely vendors or sellers and did not perform services, as required by the contract to be considered subcontractors; (4) the Valero/Kellogg contract allowed Kellogg to hire subcontractors only with Valero's consent, and there was no evidence that Valero consented; and (5) the Valero/Kellogg contract required subcontractors to purchase insurance, and there was no evidence that the Contractors purchased such insurance.  We address each argument in turn.

## A.     Law of the Case—Fisher and Zink

In *Nat'l Union II*, we affirmed the summary judgment in favor of Fisher and Zink, holding that they established that they were Kellogg's subcontractors as a matter of law. *Nat'l Union II*, 2005 WL 608229, at *5.  We remanded, however, for consideration of claims the Insurers filed after the Contractors' motions for summary judgment were filed.  *Id.* at *7.  The parties appear to dispute what survived *Nat'l Union II* and what was newly pleaded on remand.  Because of our disposition, which we explain below, we need not decide this issue.

In *Nat'l Union II*, we defined "subcontractor" as "a party who takes and performs a portion of a contract from a principal contractor or who enters into a contract for the performance of an act with a person who has already contracted for its performance." *Id.* at *5.[5]  We then held that Zink provided substantial documentation establishing its subcontractor status, including "its bid to provide the air heater, and Kellogg's subsequent acceptance of the bid in a purchase order."  *Id.*  We likewise found that Fisher provided substantial evidence, including an "inquiry" from Kellogg regarding the computer control

---

[5] The Insurers do not dispute that this is the appropriate definition of a subcontractor.

18

system, a bid from Fisher in response, and acceptance of the bid from Kellogg in the form of a purchase order. *Id.* We opined that the evidence established that Zink and Fisher contracted with Kellogg to perform work that Kellogg had already contracted to perform for Valero, bringing both within the definition of a subcontractor. *Id.* Thus, we held that the trial court did not err by granting Zink and Fisher's motion for summary judgment on these grounds. *Id.*

The Insurers argue that this Court is not bound to follow its prior decisions in *Valero*, *Nat'l Union I*, and *Nat'l Union II* and that we have discretion to reexamine Fisher and Zink's status as Kellogg subcontractors with regard to all the Insurers' claims, including those finally determined by *Nat'l Union II*.[6] Specifically, the Insurers argue that the "law of the case" doctrine only binds intermediate courts to follow holdings of a court of last resort. Zink and Fisher argue that, at least as to the claims determined in *Nat'l Union II*, the trial court was not free to reexamine those claims and was bound to determine the newly-pleaded claims the same way because the defenses raised were the same as those decided in *Nat'l Union II.*

"The 'law of the case' doctrine provides that a decision of a court of last resort on a question of law will govern a case throughout its subsequent stages." *City of Houston v. Jackson,* 192 S.W.3d 764, 769 (Tex. 2006). Conclusions of law by an intermediate court of appeals do not bar reconsideration of the conclusions in a subsequent appeal, but rather, the court of appeals retains discretion to revisit the issues depending on the circumstances of the case. *Id.* By narrowing the issues in successive stages of the

---

[6] As Fisher points out, on remand after *Nat'l Union II*, the Insurers amended their petition and reasserted the previously adjudicated claims; therefore, Fisher and Zink both moved for summary judgment on all the claims, again.

litigation, the law-of-the-case doctrine is intended to achieve uniformity of decision as well as judicial economy and efficiency. *Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 716 (Tex. 2003). The doctrine is based on public policy and is aimed at putting an end to litigation. *Id.* If the first appeal involves a summary judgment, it may not be appropriate to apply the law-of-the-case doctrine if the summary judgment evidence offered in support of the second motion materially differs from that offered in support of the first motion. *See Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986); *see also Kropp v. Prather*, 526 S.W.2d 283, 286 (Tex. Civ. App.–Tyler 1975, writ ref'd n.r.e.) ("Further, the doctrine does not necessarily apply where the issues presented at successive appeals are not identical and applies only if it appears on the second appeal that the facts are substantially the same as those involved on the first trial.").

We agree that we are not "bound" by our prior decisions, but rather, we retain discretion to revisit issues we previously decided that have not been finally determined by the Texas Supreme Court. Having decided to revisit the issues, however, we find our prior holdings to be sound, and we choose to rule the same way again with respect to all the claims. Here, although the Insurers have asserted new claims against Fisher and Zink, like those addressed in *Nat'l Union II*, the new claims are all derivative of Valero's claims against Fisher and Zink. *Nat'l Union II*, 2005 WL 608229, at *4. Thus, the affirmative defenses of release and waiver apply identically to these new claims. Fisher and Zink have submitted the same evidence submitted in support of the motions for summary judgment that we affirmed in *Nat'l Union II*. *Id.* at *5. Again, we find that Fisher and Zink have established their status as Kelogg's subcontractors as a matter of law. Whether the trial court erred by reviewing claims already affirmed by this Court is irrelevant, and we

20

need not parse through the numerous amended petitions to decipher exactly what claims have previously been decided, because Fisher and Zink moved for summary judgment on all the claims and because we find that the trial court *again* correctly determined that the evidence conclusively established that Fisher and Zink were Kellogg's subcontractors.

**B.     Valtek's Evidence of Subcontractor Status**

In *Nat'l Union II*, Valtek did not argue that it was a subcontractor entitled to rely on the release and waiver provisions of the Valero/Kellogg contract. *Id.* Thus, we did not affirm any part of the summary judgment in Valtek's favor. *Id.* On remand, however, Valtek submitted evidence of the same sort submitted by Fisher, which we found sufficient in *Nat'l Union II*, showing that: (1) Kellogg made an inquiry regarding Valtek's bypass valves; (2) Valtek submitted a bid in response; and (3) Kellogg accepted the bid in the form of a purchase order. *Id.* As with Fisher, we hold this evidence conclusively established that Valtek contracted with Kellogg to perform a portion of Kellogg's required performance under the Valero/Kellogg contract. *Id.*

We choose to follow our holding in *Nat'l Union II*, but nevertheless, we will next address the arguments made by the Insurers as to why this type of evidence is insufficient as to all Contractors.

**C.     Distinguishing Between the Fisher Entities**

The Insurers argue that the three Fisher companies have no evidence that any of them contracted with Kellogg. The Insurers claim that the "subcontract" upon which the Fisher companies rely is really one purchase order contract between Kellogg and "Fisher Controls c/o Puffer-Sweiven, Inc.," which does not refer specifically to any of the Fisher companies. Thus, they argue that the three Fisher companies cannot claim subcontractor

21

status. We disagree with the Insurers' interpretation of the purchase order, particularly in light of the Insurers' consistent allegations that all three Fisher companies had a role in the design of the control card and cabinet, which the Insurers alleged caused the citrate scrubber stack fire and which is the subject of the purchase order.

In their tenth amended petition, on which the Contractors' summary judgment was based, the Insurers referred to all three Fisher companies collectively as "Fisher" and alleged the following:

> 9. Also as part of Kellogg's provision of procurement services for Valero, on or about June 16,1981, Kellogg issued Purchase Order Number 6216-010 to "Fisher Controls c/o Puffer-Sweiven, Inc." (the "Fisher/Kellogg Purchase Order") for the sale and delivery of a Distributed Control System which included the computer control card and housing cabinet at issue herein ("Control Card and Cabinet") for installation as part of the Refinery expansion. A true and correct copy of the Fisher Kellogg Purchase Order is attached hereto as Exhibit "C" and incorporated by reference.
>
> . . . .
>
> 90. The [Citrate Scrubber Stack] Fire was caused by defects in the Valves and/or Control Card and Cabinet and resulted in covered claims for property damages in the amount of $550,345.67.
>
> . . . .
>
> 133. . . . At all material times, Fisher was involved in the business of designing, manufacturing, distributing, selling or otherwise placing into the stream of commerce computer control cards and housing cabinets such as the ones used at the Refinery.

Referring to all three companies collectively, the Insurers alleged that "Fisher" defectively designed, manufactured, installed, and inspected the control card and cabinet, among numerous other allegations seeking to hold all three Fisher companies liable for the citrate stack scrubber fire.

The purchase order on which the Insurers rely refers to "Fisher Controls," and it

22

serves as the basis for the Insurers' claims against all three Fisher companies. For example, in the Insurers' tenth amended petition, the Insurers specifically relied on the purchase order when asserting claims for breach of contract and for breach of contract-based warranties and guarantees. It is axiomatic that, if one of the Fisher companies did not perform work required by the Kellogg purchase order, it would not be liable to Valero for any portion of its damages, nor would it be liable to the Insurers for their wholly-derivative claims.

Here, the Insurers have pleaded that a contract existed in order to establish liability over all three Fisher companies, without pleading in the alternative, but now are seeking to avoid the existence of that very contract to deprive the Fisher companies of a contractually-based defense. When a party makes a clear, deliberate, and unequivocal statement of fact in a live pleading submitted to the court, that fact is conclusively established as against that party, and the introduction of other pleadings or evidence is unnecessary. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 905 (Tex. 2000). Judicial admissions relieve an adversary from making proof of the fact, and more importantly, bar the party from disputing it. *Id.*

For example, in *Auld*, the plaintiff consistently pleaded that the defendant nursing home was a "health care provider" as that term was defined in former article 4590i. *Id.* at 904. When the defendant sought to apply the damage caps in article 4590i, the plaintiff objected and claimed that the defendant failed to prove it was licensed or chartered by the State of Texas to provide health care and, therefore, was not entitled to rely on the caps. *Id*. The Texas Supreme Court held that the plaintiff's allegations in her petition precluded her from disputing that the defendant was a health care provider entitled to rely on the

23

defenses provided in article 4590i. *Id.* at 904-05.

We likewise hold that the Insurers' pleadings constitute judicial admissions that preclude them from disputing that any one of the Fisher companies was covered by the purchase order. *See id.* Accordingly, we reject the Insurers' argument that the Fisher companies were not subcontractors for this reason.

**D.      Sellers, Vendors, or Subcontractors?**

The Insurers claim that the Valero/Kellogg contract contemplated that Kellogg would deal with at least four different types of entities: subcontractors, vendors, suppliers, and third-party licensors. The Insurers contend that the contract treated each one of these categories differently for liability purposes. For example, vendors were not released from all liability but only for liability for consequential damages, and suppliers and third-party licensors were not subject to any liability at all. The Insurers argue that there are fact issues that preclude a finding that the Contractors are "subcontractors" because the alleged subcontracts repeatedly refer to the Contractors as "sellers" or "vendors," which are distinct categories in the Valero/Kellogg contract. Specifically, the Insurers allege that the Contractors contracted to sell components—not to perform any of the services that Kellogg had contracted to perform. In other words, the Insurers argue that Kellogg was still performing its procurement role, and the Contractors were merely selling Kellogg component parts. We disagree.

First, we disagree that the labels used by the purchase orders create fact issues on subcontractor status. As we held in *Nat'l Union II*, a "subcontractor" is "a party who takes and performs a portion of a contract from a principal contractor or who enters into a contract for the performance of an act with a person who has already contracted for its

24

performance." *Nat'l Union II*, 2005 WL 608229, at *5. The Insurers point to no cases that hold that the label used in a purchase order determines the seller's status under a completely separate contract, nor are we aware of any.

Second, the Insurers' argument is again contradicted by the purchase orders and their pleadings, in which they alleged that the Contractors did much more than merely "sell" the products that allegedly caused damages to the Valero plant. *See id.* The Valero/Kellogg contract required Kellogg to "design, engineer, provide procurement services together with certain construction coordination functions and furnish materials in connection with additions and modifications to its existing refining unit at Corpus Christi, Texas . . . ." The allegations in the Insurers' tenth amended petition and the various purchase orders demonstrate that the Contractors assisted Kellogg in its "design" services by designing and manufacturing the items purchased to Kellogg's and Valero's specifications.

### 1. Zink

In their tenth amended petition, the Insurers alleged that Zink manufactured a "vertical air preheater" that exploded on July 13, 1984. The Insurers, however, did not allege that Zink merely "sold" the heater to Kellogg. Rather, the Insurers alleged that Zink: (1) failed to comply with the specifications for the heater; (2) defectively designed the heater; (3) omitted an air-control mechanism; and (4) defectively manufactured the heater. All of these allegations demonstrate that Zink was not only "selling" the heater but was performing part of Kellogg's obligation to "design" components of the plant. The Insurers cannot now claim that Zink was a mere seller. *Id.*

Furthermore, the Zink purchase order expressly states that Zink would receive

25

fifteen percent of its payment upon supplying Kellogg with "drawings" for its approval, which further demonstrates that Zink was not just "selling" the heater to Kellogg but was assisting Kellogg with design duties.

### 2. Fisher

The Insurers alleged that on May 28, 1985, a citrate scrubber stack fire occurred that was caused by defects in the control card and cabinet Fisher manufactured. Again, the Insurers alleged that Fisher not only sold these items but also: (1) failed to properly design, construct, and inspect the items; (2) failed to manufacture the items according to Kellogg's specifications; and (3) negligently advised Valero as to the use of the items. Again, these allegations claim that Fisher was assisting Kellogg with its design duties and attempt to hold Fisher liable for these services. The Insurers cannot now claim that Fisher was a mere seller of the control card and cabinet. *Id.*

Moreover, the Fisher purchase order expressly states that the pricing is based on hardware; "Dedicated Project Management and Engineering"; "Staging, Integration and Testing"; and freight costs. The terms and conditions further state that the items must be manufactured in "strict accordance with . . . Kellogg specifications and drawings except where noted otherwise in this Purchase Order." Thus, Fisher was not merely "selling" items for Kellogg to incorporate into the Valero plant; it was also designing, testing, and staging these particular items on Kellogg's behalf.

### 3. Valtek

The Insurers alleged in their tenth amended petition that Valtek manufactured defective expander bypass valves that caused the citrate scrubber stack fire. The Insurers alleged that Valtek not only sold the valves but also: (1) improperly designed,

manufactured, and inspected the valves; (2) failed to properly construct the valves; and (3) failed to comply with Kellogg's specifications. Furthermore, the Valtek purchase order provides that Valtek was to supply the valves in accordance with Kellogg's specifications and that Valtek was not entitled to final payment of its invoices until it completed the order and submitted data, documentation, and drawings as required by Kellogg. The purchase order also expressly refers to "engineering" and "manufacturing" to be performed by Valtek: "All questions of a technical nature that may arise during the Engineering and/or Fabrication or manufacturing stage of this order should be directed, in writing by either telex or letter, to the Inspection Department, Pullman Kellogg . . . ." Again, both the Insurers' pleadings and the purchase orders demonstrate that Valtek was not a mere seller but also performed design functions on Kellogg's behalf.

In sum, the Insurers cannot claim that the Contractors defectively designed and manufactured these products and, at the same time, claim that the Contractors did not engage in any design or engineering services on behalf of Kellogg. *See Auld*, 34 S.W.3d at 905. Moreover, the purchase orders establish that the Contractors did much more than merely sell a product. We overrule this argument.

## E. Valero's Lack of Consent

Next, the Insurers argue that, although Kellogg was entitled to hire subcontractors, it could not do so without Valero's consent. The Insurers point to the following provision in the Valero/Kellogg contract:

> 15.2 Notwithstanding the foregoing, [Kellogg] may subcontract parts of its work to be performed under this Agreement upon obtaining the consent of [Valero] as provided in Exhibit "A"; providing, however, that in such event [Kellogg] shall not be relieved or released from any of

27

its obligations and responsibilities under this Agreement.[7]

The Insurers argue that the Contractors did not present any evidence that Valero consented under this provision; therefore, they are not entitled to rely on the waiver and release provisions in the Valero/Kellogg contract. In support of their argument, the Insurers point to an affidavit by the plant's project director, John Cotterell. Cotterell's affidavit stated that "[a]t no time did I, or anyone else at or on behalf of Valero to my knowledge, ever receive a request from Kellogg, Zink, Fisher, Valtek or anyone else that Valero consent to Zink, Fisher, or Valtek performing any of the work or obligations that Kellogg had agreed to undertake for Valero under the Valero/Kellogg Contract." The trial court sustained the Contractors' objections to this affidavit, which the Insurers claim constituted error. We need not address the Contractors' objections because we disagree that the affidavit raised a fact issue.

It is undisputed that Kellogg began work on the expansion project before a formal contract had been negotiated or signed. It is also undisputed that the Valero/Kellogg contract had not yet been signed at the time of Kellogg's purchase orders with the Contractors. Accordingly, at the time that Kellogg subcontracted with the Contractors, Valero had no right of prior approval. The contract, however, was made retroactive to the time that construction began. Thus, the Insurers argue that the Contractors had to obtain Valero's consent. The resolution of these arguments depends on whether prior approval was a "condition precedent" to enforcement of the release and waiver provisions in the Valero/Kellogg contract. We hold it was not.

---

[7] Exhibit A states that "Kellogg did not subcontract engineering work for this project." We hold this does not raise a fact issue, however, because as we noted above, the Insurers' pleadings conclusively established that the Contractors engaged in design services on Kellogg's behalf.

28

Conditions precedent in a contract are events that must occur or acts that must be performed before rights can accrue to enforce an obligation. *See Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992). Ordinarily, terms such as "if," "provided that," "on condition that," or similar conditional language indicate the intent to create a condition precedent. *Criswell v. European Crossroads Shopping Ctr.,* 792 S.W.2d 945, 948 (Tex. 1990). Conditions precedent, which can cause forfeiture, are not favored under the law, and we will not construe a contract provision as a condition precedent unless we are compelled to do so by language that may be construed in no other way. *See Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 530 (Tex. 1987). "If a contract contains a condition precedent, it must either have been met or excused before the other party's obligation can be enforced." *Cal-Tex Lumber Co. v. Owens Handle Co.*, 989 S.W.2d 802, 809 (Tex. App.–Tyler 1999, no pet.).

There is no conditional language associated with this provision that would make Valero's consent a prerequisite to its subcontractors' reliance on the waiver and release provisions. In fact, the conditional language that *is* included relates to Kellogg's continuing obligations under the contract despite a failure to obtain prior approval, which is evidence that Valero intended to look to Kellogg as its sole indemnitor for problems arising with a subcontractor's work. We hold that the consent provision was a mere covenant and not a condition precedent.

In any event, even if we were to construe the consent provision as a condition precedent, we would hold that the condition was excused or waived by Valero. The failure of a condition in a contract is excused when the party for whom the condition was intended to benefit, with knowledge of the failure of the condition, accepts performance of the

contract without insisting on satisfaction of the condition. *See* Restatement (Second) of Contracts §§ 224, 225, 246 (1981); *see also Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 751-52 (Tex. App.–El Paso 2000, no pet.); *Purvis Oil Corp. v. Hillin*, 890 S.W.2d 931, 937 (Tex. App.–El Paso 1994, no writ) (holding that parties to a joint operating agreement waived their right to insist that an operator own an interest in the properties at the time of the operator's election, as required by a condition precedent in the joint operating agreement, where the parties accepted the operator's services without objection).

Valero allowed the Contractors' products to be installed at the refinery, and now the Insurers rely on the purchase orders, which we have held demonstrate that the Contractors were acting as subcontractors, to argue that the Contractors owed duties to Valero. Specifically, the Insurers' tenth amended petition alleged that after the sale, delivery, and installation of the Contractors' products, Valero requested assistance from each of the Contractors to achieve proper operation of the products, and these requests occurred prior to the explosion and citrate scrubber stack fire. What all this shows is that Valero was aware that Kellogg had engaged the Contractors as subcontractors, yet it did not insist on the condition in the contract requiring Kellogg to obtain approval for these subcontractors. Accordingly, the condition was excused or waived by Valero's acceptance of Kellogg's performance, utilizing subcontractors, and the Contractors' performance of the subcontracts, without requiring Kellogg to obtain Valero's consent. *See* Restatement (Second) of Contracts §§ 224, 225, 246; *see also Abraxas Petroleum Corp.*, 20 S.W.3d at 751-52; *Purvis Oil Corp.*, 890 S.W.2d at 937. Thus, we reject the Insurers' arguments that the failure by Kellogg to obtain Valero's approval of the subcontracts precludes the

30

Contractors' reliance on the release and waiver provisions.

**F.      Subcontractors' Insurance Requirement**

Next, the Insurers argue that the Valero/Kellogg contract required Kellogg's subcontractors to carry insurance, but the Contractors did not present evidence that they did so. Thus, the Insurers argue that the Contractors cannot invoke the waiver and release provisions in the Valero/Kellogg contract. In contrast, the Contractors argue that the subcontractor insurance provisions are irrelevant because there is nothing in the contract that requires the Contractors to make a claim under their own policies in order to be entitled to the benefit of the release and waiver provisions. We agree with the Contractors.

The Valero/Kellogg contract requires in section 6.2(a), (b), and (c) that Kellogg obtain certain insurance policies for Valero's benefit. Section 6.2, subparts (a) and (c), require Kellogg to obtain workers' compensation insurance and automobile insurance for Kellogg's employees, and those provisions are not relevant here. Section 6.2(b), however, requires Kellogg to obtain a comprehensive general liability insurance policy benefitting Valero and limits Kellogg's liability to the amount of that policy, as follows:

>     6.2      [Kellogg] shall provide the following insurance:
>
>     . . . .
>
>     (b).     Comprehensive General Liability Insurance (including Contractual Liability, Contractor's Contingent Liability and Explosion, Collapse, and Underground damage) covering Bodily Injury and Property Damage with a Combined Single Limit of $2,000,000 per occurrence. It is understood and agreed that for the purposes of this agreement, [Kellogg] will be self-insured up to a Combined Single Limit of $2,000,000 per occurrence for bodily injury and damage to property (other than the work) arising out of [Kellogg's] rendering of professional services under this agreement.

31

[Kellogg's] liability with respect to [Valero's] property so covered shall be limited to the amount of such insurance provided that in the event of a loss aggregating more than the amount of insurance in effect at the time of such loss [Kellogg's] liability with respect to [Valero's] property shall be limited to an amount equal to the ratio of [Valero's] loss to the total amount of the loss multiplied by the total amount paid out by the insurance company with respect to such loss. [Valero] shall obtain for [Kellogg's] benefit a waiver of subrogation rights consistent with that limitation under its insurance policies, if any, covering the property. In no event shall this provision or payments made in accordance herewith be viewed as limiting [Valero's] rights to insurance coverage as an insured pursuant to paragraph 6.5(c) below.

Then, in section 6.3, the contract provides that subcontractors will be required to carry insurance of the same "types," but the amounts are to be set by *Kellogg's* standard subcontract procedures. There is no suggestion that those insurance policies were to benefit Valero instead of Kellogg:

> 6.3   [Kellogg's] subcontractors will be required to carry insurance of the types described in subparagraphs (a), (b), and (c) of paragraph 6.2 above, as appropriate, at limits considered adequate in accordance with [Kellogg's] standard subcontract procedures.

The release and waiver provisions, on which the Contractors rely, expressly state that Valero would release, defend, indemnify, and hold harmless Kellogg's subcontractors to the extent that Kellogg, not the subcontractors, was compensated by insurance. Thus, we agree that the subcontractors insurance provision is irrelevant to a determination of the subcontractors' ability to rely on the release and waiver provisions. *Nat'l Union II*, 2005 WL 608229, at *5.

Having rejected all of the Insurers' arguments, we find that the trial court did not err by holding that the Contractors qualified as "subcontractors" under the Valero/Kellogg contract.

32

## IV. EXPRESS NEGLIGENCE

The Insurers next argue that even if we conclude that the Contractors are "subcontractors" under the contract, the Valero/Kellogg contract does not validly waive or release Valero's claims based on the subcontractors' negligence because the contract does not satisfy the "express negligence" test. We disagree.

"The express negligence requirement provides that when a party is seeking indemnity from the consequences of that party's own future negligence, that intent must be expressed in unambiguous terms within the four corners of the contract." *Oxy USA, Inc. v. Sw. Energy Prod. Co.*, 161 S.W.3d 277, 283 (Tex. App.–Corpus Christi 2005, pet. denied). The express negligence doctrine applies both to indemnity and release agreements when "the effect of both is to relieve a party *in advance* of responsibility for its own negligence." *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 509 (Tex. 1993) (emphasis added). The reason for requiring a clear intent to relieve a party of future negligence is that these clauses seek to shift risk in an extraordinary way. *Id.*; *see also Green Int'l, Inc. v. Solis,* 951 S.W.2d 384, 387 (Tex. 1997). The express negligence doctrine, however, does not apply to indemnity or release agreements entered into after the transaction or occurrence giving rise to liability has already taken place. *See Oxy USA, Inc.*, 161 S.W.3d at 283.

The Insurers agree that the express negligence doctrine does not apply to contracts releasing parties from liability for negligence that has already occurred. However, they dispute that at the time the Valero/Kellogg contract was executed, the negligent acts had already occurred. The Insurers do not dispute that the purchase orders were filled and that the products were installed at the Valero facility prior to the execution of the Valero/Kellogg

33

contract in 1982. The Insurers, however, point out that the explosion allegedly caused by Zink's defective preheater occurred in 1984, and the explosion allegedly caused by Fisher and Valtek's products occurred in 1985. The Insurers claim that negligence does not become actionable until there is an injury; therefore, the express negligence rule must look to the dates giving rise to liability, including when an injury occurred. We disagree with this interpretation of the express negligence doctrine.

In *Lexington Insurance Co. v. W.M. Kellogg Co.*, the First Court of Appeals addressed a nearly identical situation. *See generally* 976 S.W.2d 807 (Tex. App.–Houston [1st Dist.] 1998, no writ). There, Kellogg agreed to "design, engineer, and construct an ethylene manufacturing facility in Louisiana for Westlake Petrochemical Corporation." *Id.* at 808. A dispute arose about the work that Kellogg performed; therefore, after Kellogg completed the project, the parties executed the following release:

> For and in consideration of the cash, invoice cancellations, credit, benefits, mutual promises, and terms and conditions provided for in this Agreement, the receipt and adequacy of which are hereby expressly acknowledged by Westlake Polymers and Westlake . . . each individually and on behalf of its respective successors and assigns, do hereby and forever RELEASE, ACQUIT and DISCHARGE Kellogg . . . their officers, employees, shareholders, affiliates, subsidiaries, directors, attorneys, agents, legal representatives, successors and assigns of and from any and all claims, actions or causes of action, known or unknown, accrued or which may accrue in the future, for damages, injury, losses, costs, charges, expenses or liability of whatsoever kind or character, known or unknown, accrued or which may accrue in the future, arising out of or relating, directly or indirectly, to any of the Released Transactions.
>
> . . . .
>
> The term "Released Transactions["]: means and includes any and all acts, omissions, promises, events, occurrences, warranties, representations, transactions, dealings, inducements or agreements of every kind or character relating directly or indirectly (i) to the negotiation, execution, performance, warranties, terms, conditions, rights and obligations, or any other aspect of the subject matter of the Project Agreement, (ii) to the Plant;

34

or (iii) to any engineering services, design work or other services of any kind or character performed directly or indirectly by Kellogg for Westlake Polymers and/or Westlake in connection with the Project Agreement for the Plant.

*Id.* Two years later, there was an explosion at the plant, and Westlake sought insurance payments from its insurer, Lexington. *Id.* Lexington, as Westlake's subrogee, threatened to sue Kellogg and to claim that the release did not apply to claims of negligence or gross negligence, so Kellogg filed a declaratory judgment action. *Id.* at 808-09. The trial court declared that the release was effective as to any claims arising from Kellogg's services at the Westlake facility. *Id.* at 809.

On appeal, the First Court of Appeals held that the express negligence doctrine did not apply to the release because it was executed *after* the negligent acts—Kellogg's provision of services at the Westlake facility—even though the explosion and resulting damages did not occur until after the release was signed:

> In the present case, the Agreement releasing Kellogg from liability, supported by consideration worth more than one million dollars, was drafted and signed after the acts which could give rise to liability were completed. The Agreement was signed after the construction of the plant had been completed, and it is uncontested a disagreement had arisen regarding Kellogg's performance. This case involves only claims for alleged negligence committed before the release was signed. Accordingly, the "fair notice doctrine" under *Dresser* does not apply.

*Id.*

We choose to follow *Lexington* because of the similarity of the facts. *See id.* Valero and Kellogg began work on the plant before finalizing their contract, and Kellogg engaged subcontractors, who began designing and providing components before the Valero/Kellogg contract was signed. Valero and Kellogg were aware of the risks that were being addressed in the contract. As we noted in *Valero*,

35

> Valero and Kellogg are sophisticated entities, replete with learned counsel and familiarity with the oil refinery industry. They negotiated their working relationship over the course of almost three years, with Kellogg submitting several proposals for Valero's review. . . . Valero, having bargaining power equal to Kellogg's, agreed to the exculpatory clause in this contract. Valero possessed the resources necessary to ascertain and understand the rights it held on the date of the signing of the contract, and those it would hold in the future. *Nevertheless, Valero, of its own accord, negotiated those rights away.*

*Valero*, 866 S.W.2d at 257-58. Accordingly, there was no "extraordinary shifting of the risks" in this case, and the express negligence rule does not apply. We overrule the Insurers' argument.

## V. Purchase Order Claims

The Insurers argue that their claims under the purchase orders are independently viable and require the Contractors to compensate them for the losses at the Valero plant. The Contractors argue that the release and waiver provisions of the Valero/Kellogg contract bar these claims and that the parol evidence rule operates to exclude evidence of the indemnity language in the purchase orders.

The Insurers further argue that their DTPA claims arising from the purchase orders could not be waived because the governing version of the statute at the time of the purchase orders deems them non-waivable. The Contractors argue that the controlling version of the DTPA is the version that was in effect when the Valero/Kellogg contract was signed, and under that version, the waiver was valid.

## A. Parol Evidence Rule

First, the Insurers argue that they have alleged claims based on the purchase orders, which they assert are "independently viable" and have not been ruled upon by this Court in our prior decisions. Specifically, the Insurers argue that the Contractors' purchase

orders with Kellogg required the Contractors to compensate Valero "for loss of and/or damage to property caused in whole or in part by the negligence or willful acts of [the Contractors] in connection with the materials furnished hereunder, including without limitation, the installation, erection, repair, adjustment or operation thereof." Thus, the Insurers argue that the waiver and release provisions in the later-signed Kellogg/Valero contract do not apply. We disagree.

As we held in *Nat'l Union II*, the purchase orders were signed prior to the formation of the Valero/Kellogg contract. *Nat'l Union II*, 2005 WL 608229, at *5. We held that the Valero/Kellogg contract was a valid, integrated agreement with respect to the parties' liability, and that therefore, the parol evidence rule prohibited enforcement of an inconsistent prior or contemporaneous agreement. *Id.* "As there was no subrogation by Kellogg to [the Insurers] of any claim it could pursue against its subcontractors, we find the provisions for liability discussed in the Zink and Fisher purchase orders were pre-empted by the express waiver of liability for Kellogg's subcontractors in the later-signed Valero-Kellogg contract." *Id.*

The Insurers argue that this holding was in error because the purchase orders and the Valero/Kellogg contract were contracts between different parties, and accordingly, neither the parol evidence rule nor the merger doctrine can allow one contract to trump, supersede, or "preempt" the other. In other words, there must be an identity of parties for these doctrines to apply. We disagree that the parol evidence rule does not apply under the circumstances of this case.

Under the parol evidence rule, extrinsic evidence that contradicts, varies, or adds to the terms of an unambiguous written agreement is incompetent and inadmissible.

37

*Zapata County Appraisal Dist. v. Coastal Oil & Gas Corp.*, 90 S.W.3d 847, 852 (Tex. App.–San Antonio 2002, pet. denied). It is true that the parol evidence rule does not apply to "strangers" to the contract; however, a third-party beneficiary of the contract may enforce the rule as against a party to the contract. *Id.*; *see also Morrison Supply Co. v. M.W. Hamilton & Co.*, 411 S.W.2d 790, 793-94 (Tex. Civ. App.–Amarillo 1967, no writ) ("We also hold that the fact appellant was not a party to the contract did not preclude the parol evidence rule as being applicable to it. Its cause of action asserted against Hamilton and Hartford is based on the contract and bond. Since Morrison was in such privity with those instruments the parol evidence rule would be applicable to it.").

The Insurers' claims are derivative of Valero's claims. Valero was a party to the Valero/Kellogg contract, which expressly stated that it constituted the "entire understanding of the parties and supersedes any and all previous agreements and representations made prior to the date of execution of this Agreement." Because Valero was bound to this provision, so are the Insurers.

Valero does not dispute that Kellogg could have sought a release from claims already existing against its subcontractors, and that is what it did in section 6.8 of the Valero/Kellogg contract. The Contractors, therefore, are third-party beneficiaries of the release provision. The parol evidence rule prohibits Valero's insurers from attempting to escape the plain language of the release provision by pointing to a separate, earlier, contradictory agreement between the Contractors and Kellogg. We adhere to our decision in *Nat'l Union II*, and we hold that the parol evidence rule prohibits the Insurers from relying on the purchase orders to escape the effect of the release and waiver provision in the Valero/Kellogg contract as to all claims.

38

**B. DTPA Claims**

The Insurers argue that they have pleaded new claims arising under the purchase orders, not addressed by *Nat'l Union II*, for DTPA violations. *See* TEX. BUS. & COMM. CODE ANN. §§ 17.46, 17.50. They assert that under the 1979 version of the DTPA, a consumer could not validly waive its claims because that version stated that "[a]ny waiver by a consumer of the provisions of this subchapter is contrary to public policy and is unenforceable and void." *See* Act of May 21, 1973, 63rd Leg., R.S., ch. 143, § 1, 1973 Tex. Gen. Laws 322 (the "1979 version"), *amended by* Act of June 8, 1981, 67th Leg., R.S., ch. 307, § 1, 1981 Tex. Gen. Laws 863 ( the "1981 version"). In contrast, the Contractors argue that the 1981 version applies, which provided:

> Any waiver by a consumer of the provisions of this subchapter is contrary to public policy and is unenforceable and void; provided, however, that a consumer, other than the State of Texas or any political subdivision thereof, with assets of at least $25,000,000 or more at the time of such transactions, acts, or practices, may by written contract waive the provisions of this subchapter . . . .

Act of June 8, 1981, 67th Leg., R.S., ch. 307, § 1, 1981 Tex. Gen. Laws 863 ( the "1981 version").[8]

---

[8] This statute has been amended many times since 1981. The current version reads:

(a) Any waiver by a consumer of the provisions of this subchapter is contrary to public policy and is unenforceable and void; provided, however, that a waiver is valid and enforceable if:

  (1) the waiver is in writing and is signed by the consumer;
  (2) the consumer is not in a significantly disparate bargaining position; and
  (3) the consumer is represented by legal counsel in seeking or acquiring the goods or services.

(b) A waiver under Subsection (a) is not effective if the consumer's legal counsel was directly or indirectly identified, suggested, or selected by a defendant or an agent of the defendant.

(c) A waiver under this section must be:

  (1) conspicuous and in bold-face type of at least 10 points in size;

39

The Insurers claim that because the purchase orders were signed before the 1981 version was enacted, the 1979 version applies, and Valero could not have waived its rights under the DTPA. The Contractors claim that the relevant contract is the Valero/Kellogg contract, which contains the release and waiver provisions, and therefore, the 1981 version applies. We agree with the Contractors.

We addressed this issue in *Valero,* as it was asserted against Ingersoll-Rand, another of Kellogg's subcontractors. There, we held:

> [Valero] contends that the 1977 version [of the DTPA] applies, the one in effect at the time the parties began negotiating this contract (1979) and at the time Kellogg began performing under it (1980). [Kellogg and Ingersoll-Rand] allege that the 1981 version, the one in effect at the time the [Valero/Kellogg] contract was signed (1982), is the applicable provision.
>
> The crux of this dispute remains whether the waiver and hold-harmless provisions in the contract are valid under the DTPA. Prior to August 31, 1981, the DTPA mandated that "any waiver by a consumer of the provisions of this subchapter is contrary to public policy and is void." On August 31, 1981, section 17.42 was amended to allow that "a consumer . . . with assets of $25,000,000 or more at the time of such transactions, acts, or practices, may by written contract waive the provisions of this subchapter."
>
> [Valero] argues that the 1981 amendment to the DTPA is to be applied prospectively only and that any cause of action arising in whole or in part prior to August 31, 1981, will not be affected by the provision allowing waivers by sophisticated corporations. Valero asserts that because it began

---

(2)      identified by the heading "Waiver of Consumer Rights," or words of similar meaning; and

(3)      in substantially the following form: "I waive my rights under the Deceptive Trade Practices-Consumer Protection Act, Section 17.41 et seq., Business & Commerce Code, a law that gives consumers special rights and protections. After consultation with an attorney of my own selection, I voluntarily consent to this waiver."

(d)      The waiver required by Subsection (c) may be modified to waive only specified rights under this subchapter.

(e)      The fact that a consumer has signed a waiver under this section is not a defense to an action brought by the attorney general under Section 17.47.

TEX. BUS. & COMM. CODE ANN. § 17.42 (Vernon 2002).

40

negotiations with Kellogg in July, 1979, and with Ingersoll-Rand in early 1981, the pre-1981 version of the DTPA must apply.

Valero maintains that Kellogg and Ingersoll-Rand made false representations during their respective negotiating periods . . . . These allegedly false representations having been made during the negotiating periods, Valero asserts that its DTPA cause of action arose at least in part at those times, and therefore the pre-1981 version of the Act must apply to Kellogg and Ingersoll-Rand.

Kellogg counters that the version of the DTPA in effect at the time the relevant contract is signed provides the controlling law. It quotes, "a contract signed before the effective date of this Act is governed by the law in effect when the contract was executed." Ingersoll-Rand contends that the provision in effect on the date the product at issue was delivered is the appropriate directive.

We hold that the date that Valero signed the contract, which it now wishes to repudiate on the grounds of unconscionability and economic duress, is the relevant date of inquiry. Kellogg and Valero negotiated this contract for almost three years. . . .

At the time of the signing of the contract, both parties were presumed to know the laws affecting their contract. They were presumed to know their rights, duties, and obligations under that contract.

On May 28, 1982, the date Valero and Kellogg signed this agreement, Valero waived any claims that may have vested against Kellogg and against Ingersoll-Rand, its subcontractor, for deceptive trade practices. At that time, the August 31, 1981, DTPA amendment allowing large corporations to waive their rights under the Act had been in effect for almost a year. Valero, a sophisticated corporation, is charged with knowing the law affecting the contract on the date that it was signed. Notwithstanding when the causes of action at issue here accrued, whether in 1979, early 1981, or much later, in 1982, the law allowed large corporations to waive their DTPA causes of action. This Valero did when it signed this contract.

*Valero*, 866 S.W.2d at 258 (citations omitted).

Contrary to the Insurers' arguments, we hold that the relevant contract is the Valero/Kellogg contract, signed in 1982, which contains the release and waiver provisions that the Insurers now seek to avoid. *See id.* As we held with respect to Ingersoll-Rand, it does not matter that the claims the Insurers make now arise from purchase orders issued

41

prior to the effective date of the 1981 amendments. *Id.* We hold that Valero, and derivatively the Insurers, validly waived all their DTPA claims in 1982.

## VI. LIMITATION OF THE RELEASE/WAIVER

Finally, assuming the release and waiver provisions are valid and apply to the Contractors, the Insurers argue that it is a limited waiver and release that only released the Contractors from damages in excess of Kellogg's insurance. The Insurers argue that the Contractors have not provided any evidence of the amount that Kellogg was compensated by insurance. The Insurers point to a statement by this Court in *Nat'l Union I*:

> To the extent that [*Valero*] may be interpreted to hold that all of Valero's claims were waived by the contract, we hold that the waiver must be limited because of our reliance on sections 6.8 and 6.9 of the agreement. In other words, Valero agreed to absolve Kellogg and its subcontractors of liability for claims to the extent the contractor was not compensated by insurance and for those losses specified in section 6.9.

*Nat'l Union I*, 972 S.W.2d at 845. The Insurers argue that because there was no evidence of where the release begins to limit damages, the trial court erred in rendering a final summary judgment. We disagree.

A fair reading of the release and waiver provision requires us to conclude that, in order to recover under the contract, the Insurers were required to look only to Kellogg for claims against both Kellogg and its subcontractors. Section 6.8 of the contract provided:

> [Valero] shall release, defend, indemnify and hold harmless [Kellogg], its subcontractors and affiliates and their employees performing services under this Agreement against all claims, liabilities, loss or expense, including legal fees and court costs in connection therewith, arising out of or in connection with this Agreement or the Work to be performed hereunder, including losses attributable to [Kellogg's] negligence, to the extent [Kellogg] is not compensated by insurance carried under this ARTICLE. [Valero] shall obtain for the benefit of [Kellogg], its subcontractors and affiliates and their employees, waiver of subrogation rights under all its applicable insurance policies.

42

(Emphasis added). The contract *does not* say that Valero could recover from Kellogg the amount Kellogg was compensated by insurance *and* recover from Kellogg's subcontractors the amount that Kellogg was compensated by insurance—such a construction would allow Valero to be compensated twice. As we noted in *Nat'l Union II*, the Valero/Kellogg contract did not provide for "subrogation by Kellogg to [the Insurers] of any claim it could pursue against its subcontractors," and that is the reason that we affirmed final summary judgment on the claims then pending by the Insurers against the Contractors without regard to the amount that Kellogg was compensated by insurance. 2005 WL 608229, at *5.

Accordingly, we hold that the lack of evidence of the amount that Kellogg was compensated by insurance does not preclude final summary judgment in the Contractors' favor. The Insurers' recourse under the contract was limited to a suit against Kellogg for those amounts.

## VII. CONCLUSION

Having overruled all subparts of the Insurers' issue, we affirm the trial court's final summary judgment.[9]

_____
GINA M. BENAVIDES,
Justice

Delivered and filed the
10th day of November, 2010.

_____

[9]The Insurers make additional arguments regarding the applicability of other preclusion theories that would require us to adhere to our prior decisions. Having revisited all the issues raised by the Insurers against the summary judgment, we conclude that these arguments are not necessary to the disposition, and we do not address them. TEX. R. APP. P. 47.4. Additionally, we need not address the Insurers' argument that the trial court erred by denying their motion for partial summary judgment. The Insurers' motion did not seek a final judgment and, in any event, raised all the issues that we have addressed in this opinion that the Insurers also raised in defense to the Contractors' motion for summary judgment. *See Nat'l Union II*, 2005 WL 608229, at *6 ("Because appellant-insurers have not filed a final summary judgment motion, we cannot render judgment at this time.").

43